**UNITED STATES of America, Plaintiff-Appellee,**

**v.**

**Edward Bradley GUIDRY, and James David Sims, Defendants-Appellants.**

**Nos. 75–1824–25.**

United States Court of Appeals, Sixth Circuit.

Argued Dec. 11, 1975.

Decided April 29, 1976.

Floyd E. Morgan, Van Cleave, Hatfield, McColpin, Werner & Morgan, Gus D. Hatfield, Chattanooga, Tenn., for defendants-appellants.

John L. Bowers, Jr., U. S. Atty., Hugh J. Moore, Jr., Asst. U. S. Atty., Chattanooga, Tenn., for plaintiff-appellee.

Before EDWARDS and MILLER,* Circuit Judges, and CHURCHILL,** District Judge.

EDWARDS, Circuit Judge.

This appeal presents interesting search and seizure problems. Appellants were convicted for violating 18 U.S.C. §§ 471 and 472 (1970) by counterfeiting federal reserve notes and possessing same. Trial proofs in relation to the offenses are overwhelming, if all of the exhibits admitted were constitutionally admissible. Appellants, however, claim that all were seized in the course of two unconstitutional searches.

The government's evidence showed that these two defendants visited the Addressograph-Multigraph Company in Chattanooga, Tennessee, to buy some supplies and to have some unusual paper trimmed to an unusual size. One of the supervisory employees of the company contacted an agent of the Secret Service and advised him of this incident. Thereupon Secret Service Agents checked the utility records of the residences of appellants and learned that at Guidry's address electric power was being used in "excessive" quantities. The federal officers then began round-the-clock surveillance of that house. They also arranged to have a service representative for Addressograph-Multigraph take Agent Jernigan with him when he made a call at Guidry's house. Jernigan was identified as a "helper" and the service representative told the defendants that he was there to look at a part of defendants' printing press which

defendants had previously told him they wanted to sell. During this visit Jernigan had an opportunity to observe the printing press and to remove a piece of paper with green ink on it from the press. Later that afternoon Jernigan went back to see defendants in an attempt to elicit information concerning counterfeiting. At the end of this second visit Jernigan concluded that at least one of the defendants had become aware of his real purpose and identity, and he so advised his superiors.

Within fifteen minutes thereafter another agent engaged in the surveillance of the residence saw someone start a fire in a carport at Guidry's address. The fire department was called and when the firemen arrived, a local police officer named Gaston told the firemen that he would like to search the Guidry house for fire and that he believed that counterfeiting operations were going on. Although the wife of one of the defendants, and one of the defendants, objected to their entry, Gaston, federal officers, and some firemen entered the residence, and the officers then seized a large quantity of counterfeit currency and equipment. Concerning the seizure of the counterfeit, Gaston testified:

Well, the firemen were checking for leakage, for sparks around the top of the house, but the several firemen and myself went through the house and in the back bedroom there were numerous garbage bags sitting in the floor, and when we opened the door, the money was in plain view through transparent plastic bags, the garbage bags.

I remember I think there were three large garbage bags that were shoved just about full and the money was in plain view.

The counterfeit seized totaled $1,678,400 in $50 and $100 bills.

Our appellate questions include whether Jernigan's first entrance in the Guidry home as a "helper" to the Addressograph-Multigraph representative was a violation

* Judge Miller concurred in this opinion prior to his death on April 12, 1976.

** Honorable James P. Churchill, United States District Judge for the Eastern District of Michigan, Southern Division, sitting by designation.

of the Fourth Amendment, and whether the search and seizure of the Guidry house after the fire in the carport was excused by exigent circumstances.

■ As to the first question, we believe Jernigan's strategem in posing as a "helper" to the Addressograph-Multigraph representative who had been asked by defendants to help sell a portion of their press was legitimate police activity in pursuance of an investigative lead and not prohibited by the Fourth Amendment. In *Lewis v. United States,* 385 U.S. 206, 87 S.Ct. 424, 17 L.Ed.2d 312 (1966), the Supreme Court said:

Without question, the home is accorded the full range of Fourth Amendment protections. See *Amos v. United States,* 255 U.S. 313, [41 S.Ct. 266, 65 L.Ed. 654] (1921); *Harris v. United States,* 331 U.S. 145, 151, n.15, [67 S.Ct. 1098, 1102, 91 L.Ed. 1399] (1947). But when, as here, the home is converted into a commercial center to which outsiders are invited for purposes of transacting unlawful business, that business is entitled to no greater sanctity than if it were carried on in a store, a garage, a car, or on the street. A government agent, in the same manner as a private person, may accept an invitation to do business and may enter upon the premises for the very purposes contemplated by the occupant. Of course, this does not mean that, whenever entry is obtained by invitation and the locus is characterized as a place of business, an agent is authorized to conduct a general search for incriminating materials; a citation to the *Gouled* case, *supra,* is sufficient to dispose of that contention.

*Lewis v. United States, supra* at 211, 87 S.Ct. at 427, 17 L.Ed.2d at 316.

While this language serves to legitimate Jernigan's entry and observations, it does not necessarily render lawful his surreptitious seizure from the press of a piece of paper with green ink on it.

As to the second question pertaining to the entry into the Guidry home after observation of the fire in the carport, we give no credence to the argument that entry was lawfully accomplished because of the need to search for fire. As we see the matter, this was clearly pretext. The District Judge's analysis of the entry in terms of the need to prevent the destruction of evidence is, however, much more substantial:

[T]here are circumstances, although they are very narrowly circumscribed, there are circumstances under which a search of a residence would be a reasonable search and, therefore, a lawful search where circumstances exist that would reasonably induce an officer to believe that the evidence that they seek to obtain would be lost or destroyed or disappeared or removed before a search warrant could be obtained.

Now, if the evidence was such that by keeping the premises under surveillance and the officers could have safely taken time to go and get a search warrant, and then return and make the search, they, of course, would be required to do just that. But, if the evidence is such that it could be readily destroyed if the officers were to take time to go get a search warrant, even though one might be obtained on a rather short notice, then, the circumstances may be such as to warrant or permit a warrantless search.

It is the opinion of the Court in this case that the circumstances were such and the emergency condition was such as to permit the officers to make a search without obtaining a search warrant, and that if they had taken the time to obtain a search warrant, it's reasonable to believe that at least a portion of the evidence would have and could have been destroyed, even though the premises was maintained under surveillance.

Now, the printing press, it's unreasonable to think that that could have been destroyed if there had been a delay sufficient to obtain a warrant, and it's perhaps not likely that the metal plate that is used to make the print from could have been destroyed. It might have been hidden or some other disposition or defaced or cut up or something of that nature rather quickly, but it is also apparent that any currency, counterfeit currency, could readily be destroyed by the very

means that the officers saw, that is, by burning it. And under those circumstances, the Court is of the opinion, as I say, that the emergency conditions did exist here and are shown to have existed here which would justify a warrantless search of the premises.

■ We agree with the District Judge that the totality of circumstances confronting the officers on the scene was such as to indicate that efforts to destroy evidence were in progress and would be likely to be completed absent prompt action in entering the premises under surveillance. While the agents, probably from the time Jernigan "blew his cover," or certainly by the time fifteen minutes later when agents observed the fire in the carport, could have obtained a search warrant, the time required might well have allowed for the destruction of all of the counterfeit money.

We recognize that the Supreme Court has not, except by dicta, passed upon whether or not the need to prevent destruction of evidence is, under circumstances like these, an "exigent circumstance" which renders a warrantless entry constitutionally reasonable. *See Warden v. Hayden,* 387 U.S. 294, 87 S.Ct. 1642, 18 L.Ed.2d 782 (1967). *Cf. Johnson v. United States,* 333 U.S. 10, 68 S.Ct. 367, 92 L.Ed. 436 (1948); *Vale v. Louisiana,* 399 U.S. 30, 90 S.Ct. 1969, 26 L.Ed.2d 409 (1970). We believe, however, that other circuits which have recognized this type of exception are correct. *United States v. Rubin,* 474 F.2d 262 (3d Cir.), *cert. denied,* 414 U.S. 833, 94 S.Ct. 173, 38 L.Ed.2d 68 (1973); *United States v. Blake,* 484 F.2d 50 (8th Cir. 1973); *cert. denied,* 417 U.S. 949, 94 S.Ct. 3076, 41 L.Ed.2d 669 (1974); *Thomas v. Parett,* 524 F.2d 779 (8th Cir. 1975); *United States v. McLaughlin,* 525 F.2d 517 (9th Cir. 1975). *Cf. United States v. Rosselli,* 506 F.2d 627 (7th Cir. 1974).

Although, on different facts, they reach opposite results, we particularly rely upon Judge Rosenn's opinion for the Third Circuit in the *Rubin* case and Judge (now Justice) Stevens' opinion for the Seventh Circuit in the *Rosselli* case.

Assuming the validity of the entry, the officers had a right first to secure the premises for their own protection, and secondly, to make sure that no one was engaged in destroying evidence in any part of the house.[1] The seizure of the great quantity of counterfeit referred to above was accomplished pursuant to these purposes when the officers found sacks of counterfeit in a back bedroom in plain view.

In *United States v. Shye,* 473 F.2d 1061 (6th Cir. 1973), this court held inadmissible the proceeds of a bank robbery which had been placed in a sack "between a water heater and an adjoining wall," saying, "All that was in plain view was a plain brown bag." The court's opinion, however, fully recognized the "plain view" doctrine applicable to contraband; and in our instant case the testimony was that the counterfeit was visible through the transparent plastic bags.

■ With $1,678,400 of counterfeit bills properly in evidence, the admission of other materials (including the piece of paper with green ink surreptitiously seized by Jernigan on his first visit) must be treated, if erroneous, as harmless beyond reasonable doubt. *Chapman v. California,* 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967). By this holding we specifically do not sanction a general search without warrant for contraband or evidence not in plain view when, as here, lawful entry has been gained for the purpose of preventing destruction of evidence.

■ Appellants also contend that failure of the police and agents to state their purpose and authority, under 18 U.S.C. § 3109 (1970), invalidates their search and seizure of the counterfeit. As to this we note that defendants were warned of the entry—and in fact were probably fully aware of the officers' authority and purpose. Additionally, we feel that the same exigent circumstances which warranted the

1. *Cf. United States v. Gargotto,* 510 F.2d 409 (6th Cir. 1974), *cert. denied,* 421 U.S. 987, 95 S.Ct. 1990, 44 L.Ed.2d 477 (1975).

entry likewise served to excuse full compliance with the strictures of § 3109. *United States v. Mapp,* 476 F.2d 67, 75 (2d Cir. 1973).

The judgments of conviction are affirmed.