**UNITED STATES of America,**
**Plaintiff-Appellee,**

v.

**Ronald L. KORMAN,**
**Defendant-Appellant.**

**No. 79–5040.**

United States Court of Appeals,
Sixth Circuit.

Argued June 21, 1979.

Decided Jan. 31, 1980.

N. C. Deday LaRene, Detroit, Mich., for defendant-appellant.

James K. Robinson, U. S. Atty., Christopher A. Andreoff, Asst. U. S. Atty., Detroit, Mich., for plaintiff-appellee.

Before WEICK and MERRITT, Circuit Judges, and PECK, Senior Circuit Judge.

WEICK, Circuit Judge.

This case involves the interception by Customs Inspectors at the Miami International Airport of a courier arriving from Bolivia, Santa Cruz, South America, carrying a yellow suitcase with a false bottom secreting 982 grams (2.2 pounds) of cocaine destined for delivery in Detroit to the buyer, and the legality of proceedings which followed.

Defendant-Appellant Korman was charged in three counts of an indictment with (1) conspiracy with intent to distribute and to distribute approximately 1000 grams (2.2 pounds) of cocaine, a Schedule II Narcotic Drug Controlled Substance in violation of 21 U.S.C. § 846, (2) possession with intent to distribute approximately 29.6 grams of cocaine in violation of 21 U.S.C. § 841(a)(1), and possession with intent to distribute approximately 3.1 grams of cocaine in violation of 21 U.S.C. § 841(a)(1).

The district court after conducting an evidentiary hearing denied Korman's motion to suppress evidence. Korman was then tried and convicted by a jury on all three counts of the indictment. He was sentenced to four years on each count to the custody of the Attorney General, the terms to be served concurrently.

On appeal to this court, Korman does not question the weight or sufficiency of the evidence supporting his conviction which was overwhelming. Instead, Korman asserts that the trial court erred in admitting evidence to the effect that after his arrest there was an alleged illegal entry into his residence which entry was for the purpose of securing the premises against destruction of evidence while the officers, after midnight, were engaged in obtaining a search warrant from a magistrate. During such entry to secure the premises, there was no seizure of any evidence by the officers.

Korman further complains that during the search of the residence authorized by the search warrant, a green ski jacket described in the affidavit for the warrant was seized, but inadvertently omitted from the warrant issued and was admitted into evidence. He also complains of error in the admission of testimony of the co-conspirators.

For the reasons hereinafter set forth, we find that no prejudicial error occurred in the proceedings and therefore affirm the judgment of conviction.

I

John Keith DeSmyter arranged for Jack Blanchard, the courier, to go to Bolivia and bring back to DeSmyter in Detroit a suitcase containing the narcotics. Blanchard was to receive $10,000 for his services.

In Bolivia, Blanchard met DeSmyter who handed to Blanchard a yellow suitcase containing the 982 grams of cocaine secreted in a false bottom in the suitcase and instructed Blanchard to take it to Detroit and contact Attorney Donald Turner in the event, he, DeSmyter, was not available.

When Blanchard arrived at the Miami International Airport he was arrested by Custom's Inspectors who discovered the 982 grams of cocaine in the false bottom of the suitcase he was carrying. Shortly after his arrest, Blanchard agreed to cooperate with the authorities in making the delivery of 29.6 grams of cocaine (replaced in the suitcase) in order to apprehend the purchaser who turned out to be Korman and other conspirators. An electronic device (beeper) was implanted in the suitcase.

After his arrival in Detroit, Blanchard made five or six monitored telephone calls to Attorney Turner. A synopsis of the telephone calls made on March 26, 1978 indicated that:

"A) Donald Turner knew Keith DeSmyter and DeSmyter was a friend and client of his.

B) Turner referred to the Holiday Inn that Blanchard was to stay at in Detroit. ("The one on Telegraph") (Corroborates Exhibit 4).

C) Jack Blanchard was a perfect stranger to Turner.

D) Turner advised Blanchard on some alternative motels close to the Holiday Inn he was to stay at and that if anyone called looking for Blanchard he would advise him.

E) Turner, based on the conversation, was advised by Blanchard that someone was to come to the hotel room and pick up a suitcase from Blanchard with "stuff" in it.

F) Turner advised Blanchard, "If you don't get a room at any of the places, call me back."

G) Turner informed Blanchard he doesn't know of a way to get in touch with DeSmyter.

H) Turner asks twice what kind of phone Blanchard was calling on.

I) Turner tells Blanchard that he introduced Keith DeSmyter the last time he was in town to a friend of his, and that "they got along pretty well together."

J) Blanchard advised Turner that he did business for Keith DeSmyter in Bolivia and that he was advised by DeSmyter that if he had any complications was to call Turner.

K) Turner stated that "certain people play with big things."

L) Turner also stated that the kind of things that Keith likes to play with are "airplanes or whatever."

M) Turner further advised Blanchard that "you're talking about a lot of money."

N) Turner also informed Blanchard that "people can . . . get hurt over" these things.

O) Turner told Keith DeSmyter that he did not want to know what was going on.

P) Turner acknowledged to Blanchard that another close friend of his was interested in meeting Keith DeSmyter and that DeSmyter had called him before he went to Bolivia.

Q) That Turner's close friend and Keith wanted to get together, "let's put it that way," and that this friend had passed up talking to some other friends.

R) Turner advised Blanchard that a friend of Keith's got busted at the Florida airport with "4 pounds of something." Blanchard advised Turner "he's the only one that came in."

S) Turner informed Blanchard that he will call this friend of his to see if he knows anything.

T) Turner advised Blanchard that if this friend had previously contacted Keith and that "if he wants to talk to you I'll tell him where you're at." "The guy is straight."

U) That Turner advised Blanchard that he called this guy—that he apparently knew about "this" and he had talked to Keith "Before he left."

V) Turner described this man's physical appearance; that the guy will use a fictitious name "Sonny" and that he's been waiting and will come to your room." (Government's Brief pp. 6–8)

Shortly after these telephone calls were made by Blanchard to Turner, Sonny (Korman) arrived at the hotel room of Blanchard in Southfield, Michigan wearing the green ski jacket. Blanchard delivered the suitcase to Korman containing the beeper and 29.6 grams of cocaine secreted inside and the key for the suitcase. Korman left the hotel and met an unidentified male and proceeded to his 1978 Oldsmobile placing the suitcase in the trunk of the car. At the same time a 1978 Lincoln driven by the unidentified male followed Korman in what appeared to be counter-surveillance. The agents also followed Korman to his place of residence where at least three and possibly four automobiles including Korman's were parked in front of his house.

Korman then left his place of residence driving at a high rate of speed and was arrested by the agents about 400 feet away.

The district judge in finding an emergency and that exigent circumstances existed which permitted the securing of the premises in the manner which was done by the agents stated:

"Notwithstanding that, however, the court still finds that the agents were possessed of knowledge, and that we had the type of situation present here, the type of exigent circumstances, which allows the securing of premises in this manner as was done by the agents in this case. The court will not repeat at length matters that we have gone over in this case earlier concerning the surveillance of the narcotics in question, the implanting of the electronic device in the suitcase, the substitution for the original product of some cocaine plus some neutral substance to simulate the cocaine. Those factors are all significant because of what they would reasonably leave the agents to conclude might be happening. As the surveillance was recounted again today, they were following the individual who ultimately turned out to be Defendant Korman in this matter both visually and also by the use of this electronic beeping device. In the course of that surveillance, they also observed another car, described as a Lincoln, which the agents in their opinion concluded was in proximity to the automobile being specifically surveilled for the express purpose of serving as a counter-surveillance vehicle. Upon ultimately following the beeper, after losing contact for awhile, to what they ultimately learned to be the Sherwood address in Huntington Woods of the defendant, they continued to surveil the house and observed, among other things, the presence of—counting the defendant's car—at least three automobiles and, depending upon which version you credit of the testimony given earlier today, possible four automobiles. Insofar as which version to credit is concerned, the court would have no reason to discredit the agent's version because Mrs. Korman's version is not re-

ally contrary thereto. It merely states that at an earlier point in time, she was aware of only two Cadillacs and one Oldsmobile being—the latter being the car that her husband ultimately exited the premises in.

At or about one o'clock in the morning, the agents observed the Defendant Korman exit in a hurried manner, quickly get in his car and depart the scene. And at that time, the decision was made and, as defense counsel said, as far as he is concerned for the purposes of this motion anyway, legitimately, to arrest the defendant at that time. The defendant at the point was not cooperative with the officers in any way, not to suggest there is any requirement that he be such. But it is an ingredient in the subsequent decisions made by the officers. The officers has ascertained that the suitcase was not in the car and that none of the contraband was in the car or on the person of the Defendant Korman. And they also, the testimony indicates today, were not able initially to determine by their electronic tracking devices whether the suitcase had been in the car at the time that it left. But a subsequent search of the car revealed that it wasn't.

At that point, the totality of the circumstances reasonably suggested to the agents that some emergency had occurred, that the defendant had either become aware of the implanted beeper, had become aware that there had been a substitution for some of the cocaine that had been in the suitcase; and that, coupled with what they thought to be or could have been at least the presence of other individuals back at the residence, led them to reasonably conclude that evidence and contraband was in immediate danger of being destroyed, and led them to secure the premises in the manner that was testified to.

In that regard, it should be further noted that the substance cocaine that was being dealt with here was in a relatively limited quantity and is a substance that is extremely easy to dispose of. Additionally,

the beeper itself is a small electronic device which is easily destroyed or disposed of.

Furthermore, not that the conduct of the agents thereafter would justify what would be an otherwise illegal action, it should be noted that there is no suggestion, particularly from the testimony offered by the wife of the defendant here, that the agents were knocking down doors or otherwise conducting themselves in a manner other than was minimally necessary to secure the premises.

It is also to be noted in this regard that the case law is clear that the agents, in reaching a decision of the nature that they did here, need only have sufficient information to justify the warrantless entry to reasonably conclude that evidence would be destroyed or removed. A hindsight, Monday-morning quarterback position, which might show that in fact that was not about to happen, is not the standard by which their conduct is to be judged, but rather the situation as it appeared to them at the time.

So the court accordingly concludes that there was sufficient information and that the totality of circumstances in the possession of the agents at that time led them to reasonably conclude that it was necessary to secure the premises in question, that they did so with a minimum of intrusion, and they subsequently secured as the court has ruled, a proper search warrant which ultimately resulted in the seizure of the other items that we are here connected with.

So, for those reasons, the court is denying the motion to suppress." (App. pp. 93–97)

In discussing the admissibility in evidence of the green ski jacket, the district judge stated:

"The search warrant and affidavit in question were issued in connection with a narcotics investigation subsequent to an arrest of one of the alleged principals and subsequent to the securing of the residential premises at which resided Mr. Korman, who was the alleged arrested principal in regard to this case.

It is significant to note that the warrant was obtained in effect in the middle of the night, and that the agents, after securing the premises, had to call and get out of bed an assistant United States attorney, who helped them formulate the preparation of the affidavit, put it in appropriate language, which was then taken to a magistrate, also in the middle of the night, and was reviewed and a search warrant issued.

All of the papers that the court has before it—and presumably they are what was presented to the magistrate, or photocopies thereof—are handwritten, is that correct, Mr. Andreoff?

MR. ANDREOFF: That is correct, with the exception of the beeper warrant, your Honor, which was attached.

THE COURT: The handwritten affidavit is relatively lengthy and also in part relatively difficult to read. But insofar as it is pertinent to the matter under discussion here, it does indicate, in what appears to be paragraph 1 thereof, that the agents, in the course of securing the residence observed in open view an Oldhouse triple-beam scale, commonly used in the weighing of controlled-substance, the green ski jacket worn by—is the reference to "Sonny"? Is that the—

MR. ANDREOFF: (Interposing.) That is correct.

THE COURT: (Continuing)—the name that the individual was known by at that time in the state of knowledge—the green jacket worn by Sonny when the suitcase was obtained at the hotel.

That language is somewhat out of context and is more meaningful when the other affidavit that was involved with the other search warrant and was earlier issued and attached hereto is read, in which it explains the circumstances leading to the pick-up of the narcotics at the hotel and the description therein of another unknown person coming to the hotel. This was the person who was wearing the green ski jacket.

Pursuant to that type of representation, the warrant ultimately issued in language that reads as follows relative to what could be seized. And I quote: ". . . a yellow Oshkosh suitcase, eighteen inches high, twenty-six inches long, eight inches deep with chrome fasteners on top with no markings and a yellow plastic handle containing 28 grams of cocaine, said article being utilized for purposes described in affidavit, scales, paraphernalia, monies, firearms and other instrumentalities also utilized for said purposes."

There is no doubt that the ski jacket was specifically referenced in the affidavit and could have specifically referenced in that portion of the search warrant itself which enumerates those items to be seized.

However, viewing the totality of the circumstances here and all of the allegations of the affidavit, and the language that was actually used, it is the ruling of the court that the phraseology "other instrumentalities and/or paraphernalia" is broad enough and properly includes the green jacket which was specifically referenced in the affidavit for the search warrant.

The court reaches that conclusion primarily for two reasons. First of all, there is no doubt that based upon what was presented to the magistrate, he had sufficient before him to find probable cause for the seizing of the green ski jacket. The fact that it isn't mentioned specifically should not cause the warrant to be viewed as defective in that aspect in the opinion of this court, however, because to do that would be to engage in the type of hypertechnicalities and literal-mindedness which the Supreme Court of the United States has criticized in such cases as Vantreska, again remembering that the underlying thrust of those cases is to encourage officers to stop and take the time to get the warrant in question. Here we have a middle-of-the-night situation, we have an assistant United States attorney being reached by telephone, we have a magistrate being gotten out of bed in the middle of the night, we have a handwritten affidavit. And it appears clear that the green ski jacket was within the purview of the knowledge of the magistrate when he issued this, and the fact that they chose at that hour of the night to use some relatively broad language in describing that which was to be seized is not enough to defeat the warrant in this particular.

Now, an argument could be made that that language is broad enough to include the seizure of all kinds of things. But we are not dealing with that kind of speculative situation. We are talking at this time only about the green ski jacket. And the court's ruling is limited in that regard.

This brings us then to the question of whether the entire procedure met the requirements of the Fourth Amendment and other constitutional protections to be afforded to the defendant in this regard. It is the conclusion of the court that proper procedures were followed; and, accordingly, the motion to suppress is denied." (App. pp. 88–92)

▆ In our opinion, there was substantial evidence to support the factual findings of the district court with respect to the emergency and exigent circumstances and they are not clearly erroneous. Its conclusions of law were correct. The district court did not err in denying the motion to suppress.

In the present case, the DEA agents were confronted with dealers in narcotics and conspirators caught red-handed. The narcotics were worth a large sum of money when processed for sale at destination. The dealers in narcotics are well known to be dangerous criminals usually carrying weapons. The officers are risking their lives in confronting and arresting them. The case was tried before Judge Ralph Guy, of the Eastern District of Michigan. Judge Guy was a former United States Attorney who has tried cases involving narcotics violations both as an United States attorney and as a judge. He was familiar with the applicable law which he properly applied in the

present case. *Michigan v. Tyler*, 436 U.S. 499, 98 S.Ct. 1942, 56 L.Ed.2d 486 (1978); *United States v. McLaughlin*, 525 F.2d 517 (9th Cir. 1975), *cert. denied*, 427 U.S. 904, 96 S.Ct. 3190, 49 L.Ed.2d 1198 (1975) followed in *United States v. Grummel*, 542 F.2d 789 (9th Cir. 1976) *cert. denied*, 429 U.S. 1051, 97 S.Ct. 763, 50 L.Ed.2d 767 (1979) and *United States v. Fulton*, 549 F.2d 1325 (9th Cir. 1977). See also *United States v. Guidry*, 534 F.2d 1220 (6th Cir. 1976).

As appellate judges, we ought not to engage in hypertechnicalities which will hamstring capable and conscientious officers of the law endeavoring to properly perform their duties in protecting the public from harmful drugs. The airports have been used extensively by narcotics dealers to transport huge quantities of dangerous drugs from the seaports to inland cities like Detroit. This court has reviewed many of these cases. One of them is presently pending in the Supreme Court awaiting decision after oral argument. *United States v. Mendenhall*, —— U.S. ——, 100 S.Ct. 42, 62 L.Ed.2d 29, on writ of certiorari to review United States Court of Appeals for the Sixth Circuit en banc decision reported at 596 F.2d 706.

## II

Irrespective of the legality of the initial entry into the residence to secure the premises, we can nevertheless examine the balance of the underlying search warrant affidavit for probable cause in order to determine whether the evidence lawfully obtained was sufficient to determine that the search and seizure should be upheld.

We agree with the district court that probable cause existed. We are also of the opinion that disregarding any alleged information illegally obtained set forth in the affidavit for search warrant, that the independent and legitimately obtained evidence established probable cause.

The decision of the Supreme Court in *Franks v. Delaware*, 438 U.S. 154, 170–171, 98 S.Ct. 2674, 2684–2685, 57 L.Ed.2d 667 (1978) is controlling.

When paragraph 15 of the affidavit for the search warrant is excluded, the facts asserted in the balance of the affidavit certainly established probable cause to believe that evidence of a crime was located on the premises of Korman's residence and that the premises was the site of the suitcase containing the cocaine.

We are further convinced beyond a reasonable doubt that any error in the proceedings was harmless, *Chapman v. California*, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967). This is true particularly with respect to the conspiracy count. The sentences on the remaining counts, which involved cocaine found in the suitcase after its seizure and cocaine found in the residence, were concurrent.

## III

The green ski jacket although seen in plain view and subject to seizure at the entry to secure the premises, was not seized or searched until the search warrant was issued and executed. It was seized pursuant to a lawfully executed search warrant. *United States v. McLaughlin, supra, United States v. Guidry, supra*. It constituted evidence of the commission of a criminal offense and was an instrumentality of a crime. It could be seized although not specifically listed in the search warrant. *United States v. Alloway*, 397 F.2d 105, 110–111 (6th Cir. 1968).

We are of the opinion for the reasons stated by the district court that it did not err in admitting in evidence telephone conversations of Donald Turner, a co-conspirator pursuant to Rules 104(A) and 801(d)(2)(E) of the Federal Rules of Evidence. *United States v. Enright*, 579 F.2d 980 (6th Cir. 1978).

The judgment of conviction is affirmed.

MERRITT, Circuit Judge, dissenting.

Government agents entered the residence of Appellant Korman in suburban Huntington Woods, Michigan, to "secure" it pending issuance of a search warrant for cocaine they already had probable cause to believe

was there. Once inside, they conducted a "protective sweep" of the premises and acquired information that, along with what they already knew, led to the issuance of a search warrant. The principal question on appeal is whether there were "exigent circumstances" justifying a warrantless entry. I would hold that the agents' entry violated the Fourth Amendment and that the evidence ultimately seized under the warrant should have been suppressed at Korman's trial.

## I.

After a jury trial, Korman was convicted of conspiracy to possess with intent to distribute approximately 1,000 grams of cocaine (count one), 21 U.S.C. § 846 (1976); possession with intent to distribute 29.6 grams of cocaine (count two), 21 U.S.C. § 841(a)(1) (1976); and possession with intent to distribute approximately 3.1 grams of cocaine (count three), *id.* He was sentenced to concurrent four-year prison terms on each count.

At the hearing on Korman's motion to suppress, the testimony showed that on March 25, 1978, Jack Blanchard was arrested upon his arrival at the Miami airport from Bolivia as he attempted to smuggle 982 grams of cocaine hidden in a false-bottom suitcase past U.S. Customs Inspectors. He told the arresting agents that Keith DeSmyter had sent him to Bolivia to pick up the cocaine and had directed him to take it to Detroit where he should contact Donald Turner, an attorney, for further instructions in the event DeSmyter himself was unavailable. Blanchard agreed to cooperate with the agents by continuing his journey to Michigan under surveillance.

After checking into a hotel in Southfield, Michigan, Blanchard had several telephone conversations with Turner that were tape-recorded with Blanchard's consent. During the last conversation, Turner told Blanchard that he was sending a friend over to the hotel to pick up the cocaine. Appellant Korman soon arrived at Blanchard's hotel room, and Blanchard gave him a suitcase containing 29.6 grams of cocaine and a hidden electronic beeper.

The agents tracked Korman and the suitcase to Korman's residence. A few minutes after the agents arrived, at about 1:00 A.M. on the morning of March 28, 1978, they observed Korman leave the house in a hurry and drive away at a high rate of speed. He was intercepted and arrested as he turned the corner at the end of the block, approximately 400 yards down the street from his house. The suitcase was not in the car.

The agents asked Korman's permission to enter and search his house but were refused. He told them that only his wife and children were at home. The agents then went to the Korman residence. When Mrs. Korman answered their knock at the front door, they told her that Mr. Korman had just been arrested on drug charges and that they were "securing" the residence pending the issuance and execution of a search warrant. Mrs. Korman did not resist their entry, told them that only she and her children were at home, and led them to the bedroom where the children were sleeping. The agents conducted what the government terms a "protective sweep of the residence for any other armed suspects or persons involved in the crime, and to ascertain whether the controlled substance or any of the evidence was being destroyed." Government brief at 13. The agents saw in plain view a set of scales commonly used to weigh and measure narcotics, some powdery residue on a night stand, and the green and yellow ski jacket Korman had worn to Blanchard's hotel room in which they found a large wad of cash.

The information gathered during the "protective sweep" was incorporated into an affidavit, along with a chronicle of the events leading up to Korman's arrest. One drug enforcement agent remained at the Korman house to maintain security. The rest left with the affidavit to obtain a warrant.

At approximately 4:00 A.M., the other agents returned with a warrant authorizing a search of the premises. The search turned up the bugged suitcase containing 29.6 grams of cocaine; another 3.1 grams of

cocaine found elsewhere in the house; Korman's green and yellow ski jacket; narcotics records; assorted other narcotics paraphernalia; and more than $4,000 in cash. Among Korman's records, the agents found an address book containing the names "John Keith DeSmyter" and "Donald A. Turner" with corresponding telephone numbers and addresses. All of these items were introduced at trial over Korman's objection that they were fruits of an unlawful search and seizure.

## II.

The warrantless entry of Korman's home "to secure the premises," and the "protective sweep" which followed, constituted a "search" within the meaning of the Fourth Amendment. *Hester v. United States*, 265 U.S. 57, 58–59, 44 S.Ct. 445, 446, 68 L.Ed. 898 (1924). It is axiomatic that "searches conducted outside the judicial process, without prior approval by judge or magistrate, are *per se* unreasonable under the Fourth Amendment—subject only to a few specifically established and well-delineated exceptions." (footnotes omitted) *Katz v. United States*, 389 U.S. 347, 357, 88 S.Ct. 507, 514, 19 L.Ed.2d 576 (1967). The question, therefore, is whether the entry fell within any of the exceptions to the warrant requirement.

For obvious reasons, the Supreme Court has never recognized a "securing-premises-in-anticipation-of-a-search-warrant" exception to the warrant requirement. See *United States v. Griffin*, 502 F.2d 959 (6th Cir.), *cert. denied*, 419 U.S. 1050, 95 S.Ct. 626, 42 L.Ed.2d 645 (1974). Such an exception would swallow the rule. The warrant requirement protects the privacy of the home by "interpos[ing] a magistrate between the citizen and the police . . . so that an objective mind might weigh the need to invade that privacy in order to enforce the law." *McDonald v. United States*, 335 U.S. 451, 455, 69 S.Ct. 191, 193, 93 L.Ed. 153 (1948). This crucial protection would evaporate if the police, before obtaining a warrant, could search a private home without one to make sure that what they were looking for was really there and would still be there when the warrant arrived. No doubt things would be easier for the police were that option available, "[b]ut the Fourth Amendment reflects the view of those who wrote the Bill of Rights that the privacy of a person's home and property may not be totally sacrificed in the name of maximum simplicity in enforcement of the criminal law." *Mincey v. Arizona*, 437 U.S. 385, 393, 98 S.Ct. 2408, 2414, 57 L.Ed.2d 290 (1978).

The government contends, however, that a new exception to the warrant requirement need not be fashioned for this case, because the exigent circumstances doctrine is broad enough to justify the agents' conduct. The argument is that it was necessary to enter the house without waiting to secure a warrant in order to prevent the possible destruction of the cocaine by Korman's confederates. The District Court approved the warrantless entry on this theory.

The agents testified that "securing" and "protective sweep" of the residence was necessary because one of Korman's confederates may have been engaged (again using para-military language) in "counter-surveillance," meaning, I take it, that the confederate may have been watching Korman's house to see if Korman was being watched. They testified that, after Korman left Blanchard's hotel room with the bugged suitcase and drove away in his car, he was followed by an unidentified man driving a 1978 Lincoln. The two cars stopped, a few miles away, parked side-by-side, and Korman conferred briefly with the man before driving home alone. The agents testified that the driver of the Lincoln was probably engaged in "counter-surveillance." The agents also testified that they noticed three cars parked in the driveway of the Korman home, indicating to them that more than just Korman and his family were there. Given the ease with which cocaine can be destroyed, and in view of Korman's suspiciously hurried departure from the house just prior to his arrest, the fact that he did not bring the cocaine with him, the earlier-detected "counter-surveillance" by the man in the Lincoln, the presence of other vehi-

cles in the Korman driveway, and the lateness of the hour, the agents, according to the government, could justifiably have believed that the evidence was in danger of destruction and that they were, therefore, empowered to enter the house without waiting to secure a warrant.

The inherent destructibility of cocaine alone cannot justify the warrantless entry in this case. Most forms of real evidence can be easily removed, hidden, or destroyed. Drugs can be consumed or poured down the drain. Bloodstains can be mopped up; fingerprints, wiped away. Weapons can be concealed or removed from the premises. Incriminating documents and counterfeit can be burned. The possibilities are endless. If we were to hold that the ever-present danger of losing evidence was, by itself, enough to dispense with the warrant requirement, it is difficult to conceive of a case in which a warrant would ever be required to search a private dwelling.

The government's citation to *Ker v. California*, 374 U.S. 23, 83 S.Ct. 1623, 10 L.Ed.2d 726 (1963), is inapposite. In that case, the Supreme Court determined that the danger of evidence destruction excused the failure of the police *to give notice* before they entered a private home to make a lawful arrest. But the entry itself was legal. It was justified as necessary to effectuate the arrest. See *Katz v. United States*, 389 U.S. 347, 355 n. 16, 88 S.Ct. 507, 513 n. 16, 19 L.Ed.2d 576 (1967).

The government's reliance upon our decisions in *United States v. Guidry*, 534 F.2d 1220 (6th Cir. 1976), and *United States v. Delguyd*, 542 F.2d 346 (6th Cir. 1976), is misplaced. In those cases, the Court approved warrantless entries of private homes where the investigating agents were justified in believing that evidence was actually "in the process of destruction." *Vale v. Louisiana*, 399 U.S. 30, 35, 90 S.Ct. 1969, 1972, 26 L.Ed.2d 409 (1970). See also *Schmerber v. California*, 384 U.S. 757, 86 S.Ct. 1826, 16 L.Ed.2d 908 (1966). In neither case did this Court suggest that warrantless searches of private dwellings could be conducted merely upon the possibility

that evidence could be lost in the time necessary to obtain a search warrant.

Ethically and historically our society strongly resists warrantless break-ins of private homes. The Founding Fathers adopted the Fourth Amendment to prevent this specific practice, a practice that was a contributing cause of the revolution of the American colonies.

The "exigent circumstances" exception to the warrant requirement depends on the existence of a real emergency. See *United States v. Finazzo*, 583 F.2d 837, 845–47 (6th Cir. 1978), *rev'd on other grounds*, 441 U.S. 929, 99 S.Ct. 2047, 60 L.Ed.2d 657 (1979). An emergency in turn depends on the immediacy of the peril and requires a high degree of probability that the risk will become a reality. The facts must demonstrate that the risk is highly probable, that it is more likely to occur than not.

Although the probability of the risk of destruction in the instant case must be measured by the officers and the court before the warrantless entry, the facts in hindsight are relevant. Here there was no proof at all that the evidence would have been destroyed. There was no proof about how the remaining occupants of the house would have known they were under surveillance or that apprehension was likely. In fact, they did not know.

At the time of Korman's arrest, the officers were faced only with the possibility of destruction, not the high degree of probability required for a warrantless entry. The only thing the agents had reason to believe in these circumstances was that the cocaine remained inside the house. The facts did not warrant anything more. No evidence was presented at the suppression hearing to indicate that Korman's arrest could have been detected by anyone inside the house with a motive to destroy the cocaine. Indeed, the only information on that score indicated that Korman's arrest took place around the corner on another street, approximately 400 yards away from the Korman residence. None of the agents recalled seeing the 1978 Lincoln anywhere in the vicinity or any other evidence of "counter-

surveillance." If Korman's swift departure from his house is taken to indicate that he had learned of the officer's presence and was leaving others behind to destroy the evidence, the evidence would have already been destroyed by the time the officers returned to the home after the arrest. It is possible, but only one of many possibilities, that avoidance of apprehension and destruction of the cocaine was the purpose of the swift departure.

### III.

The government also contends that suppression is not warranted because the information gathered as a result of the unlawful entry and "protective sweep" was not material to the finding of probable cause which led to the issuance of the warrant. The agents already had sufficient evidence to obtain a search warrant. The evidence seized under the warrant, therefore, cannot be said to have been "tainted" by the antecedent illegal conduct. The government argues that *Franks v. Delaware*, 438 U.S. 154, 98 S.Ct. 2674, 57 L.Ed.2d 667 (1978), requires that we adopt this analysis.

I disagree. In *Franks*, the Supreme Court considered the consequences that should follow a determination that law enforcement officers had incorporated intentional or reckless falsehood in a search warrant affidavit. Suppression is required, the Court held, only when the false data is material to the finding of probable cause. Thus, after *Franks*, the proper approach for a reviewing court is to ascertain whether, setting aside the false material, the remainder of the affidavit establishes probable cause.

*Franks* involves no more than a rather straightforward application of the familiar principle that the exclusionary rule should be "restricted to those areas where its remedial objectives are . . . most efficaciously served." *United States v. Calandra*, 414 U.S. 338, 348, 94 S.Ct. 613, 620, 38 L.Ed.2d 561 (1974). An unscrupulous law enforcement officer is tempted to include false material in a search warrant application because he desires to insure that the

magistrate will find probable cause and issue the warrant. The remedy fashioned by the Court in *Franks* effectively removes that incentive by destroying any advantage the police might hope to gain from lying. The deterrent purposes of the exclusionary rule are served. A rule requiring automatic suppression without regard to the materiality of false information in a search warrant affidavit would be overkill just as would conviction of securities fraud or perjury for irrelevant misrepresentation.

The type of police misconduct involved in this case—illegal entry—is critically different from cases involving misrepresentation. It requires a different response if the deterrent purposes of the exclusionary rule are to be "efficaciously served." The need to gather more probable cause was not a primary, or even significant, factor in the agents' decision to make the warrantless entry of the Korman residence. Rather, the agents acted, as they told Mrs. Korman at the time, to "secure" the premises until the search warrant they were confident of obtaining could arrive. The advantage to be gained in most cases from such action exists wholly apart from the need to comply with the Fourth Amendment's probable cause requirement. Indeed, the more certain the police are of their probable cause, the stronger will be their desire to "secure" the place they aim to search, so that the effort to obtain a warrant will not be in vain.

The only effective means of removing this temptation is to suppress all evidence taken from the place "secured," whether or not the warrant pursuant to which the evidence is ultimately seized could have been obtained without the illegality. On facts virtually identical to our own, a panel of this Court, consisting of then Chief Judge Phillips, former Chief Judge Weick, and present Chief Judge Edwards, concluded that "[a]ny other view would tend in actual practice to emasculate the search warrant requirement of the Fourth Amendment." *United States v. Griffin, supra*, 502 F.2d at 961. Unnecessary misrepresentations may be deleted under *Franks* but we cannot

permit unnecessary and illegal entry into homes without destroying the protections guaranteed by the Fourth Amendment.