**UNITED STATES of America,
Plaintiff-Appellee,**

v.

**Robert Kenneth LOMAS,
Defendant-Appellant.**

**UNITED STATES of America,
Plaintiff-Appellee,**

v.

**Peter Kahn MARGOLIS,
Defendant-Appellant.**

Nos. 81–1768, 81–1788.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted Oct. 8, 1982.

Decided April 12, 1983.

As Amended May 17 and Aug. 15, 1983.

Kenneth Bauman, Asst. U.S. Atty., Portland, Or., for the U.S.

Paul Denton, Denton & Thynne, Denver, Colo., and Marcus S. Topel, Topel & Goodman, San Francisco, Cal., for defendants-appellants.

Before WALLACE, FARRIS, and NELSON, Circuit Judges.

FARRIS, Circuit Judge:

Peter Kahn Margolis and Robert Kenneth Lomas appeal their convictions under 21 U.S.C. §§ 841(a)(1) and 846 for participation in a conspiracy to possess with intent to distribute cocaine. Both Margolis and Lomas made numerous pretrial motions, all of which were denied. Margolis and Lomas then agreed to submit to a bench trial on stipulated facts. In return, the government pledged to move for dismissal of two of the three counts in the indictment with which each was charged. The district court convicted both on the conspiracy count and sentenced each to six years imprisonment. They now appeal the denial of their motions which sought dismissal of the indictment, challenged the validity of their arrests, and requested the suppression of evidence obtained by federal agents while searching a hotel room registered in Margolis's name.

## FACTS

Margolis and Lomas were arrested during the culmination of a police undercover operation led by Drug Enforcement Administration Special Agent E. Neil Van Horn. The investigation was initiated through Edward Cunningham, a Drug Enforcement Administration informant who stated that he had sources who could supply cocaine in South America and that he knew people who could distribute narcotics in the United States. In New York during September 1980 Cunningham introduced Van Horn to Robert Judge Billock, a cocaine distributor. The Drug Enforcement Administration's original plan was to cast Van Horn in the role of a broker who could arrange to purchase a large amount of cocaine in South America and who had access to buyers in the United States able to distribute the contraband.

The scheme was designed to catch individuals on both the supply and distribution ends of the transaction.

Unfortunately for the success of the plan, Cunningham travelled to Brazil to deal on his own behalf. By the beginning of January 1981, Van Horn realized that the Drug Enforcement Administration had lost control of him. Billock travelled to Rio de Janeiro to arrange a purchase through Cunningham but left empty-handed. In order to salvage the distribution half of the operation, Van Horn placed a call to Billock and suggested that while he was still in Brazil he meet with Special Agent Edward Magno, who posed as a cocaine supplier. Upon Billock's return he and Van Horn discussed the possibility of obtaining a supply of cocaine through the undercover agent.[1]

Peter Hans Vandervoort, an acquaintance of both Cunningham and Billock, also became interested in this new source of supply. Vandervoort led the conspiracy which is the subject of the instant prosecution. In addition to Vandervoort the group consisted of Glen Satterfield, Robert David James, Fredrick Calvin Para, Craig Allan Para, Margolis, and Lomas.[2]

After two January meetings, one of which was attended by Van Horn's purported supplier, and a series of phone conversations, Van Horn saw Vandervoort and Satterfield in San Jose, California, on March 2. Van Horn agreed to deliver ten kilograms of cocaine to Portland, Oregon, for a cash payment of $230,000 upon delivery and an additional installment of $130,000 within two weeks. They were to complete the transaction in a bank safe-deposit vault. The three men confirmed their plans at a

1. On April 17, 1981, within an hour of the arrests in Portland, Billock and several associates were apprehended in New York City when they delivered $56,000 as a down payment to Special Agent Magno for six kilograms of cocaine.

2. Like Margolis and Lomas, Vandervoort and Craig Para agreed to submit to a bench trial upon stipulated facts. They too were convicted of conspiracy to possess with intent to distribute cocaine. In a trial before a jury James was convicted on the conspiracy charge. The jury also found him guilty of attempted possession of cocaine with intent to distribute in violation of 21 U.S.C. §§ 841(a)(1) and 846 and of travelling in interstate commerce to promote, establish, and carry on an unlawful activity in violation of 18 U.S.C. § 1952. Upon the government's motion the district judge dismissed the indictment as to Fredrick Para. Satterfield failed to appear for trial.

March 21 meeting and set a tentative delivery date of April 15.

On the morning of April 15 both Satterfield and Van Horn were in Portland. Satterfield called Van Horn and informed him that he was staying at the Coliseum Holiday Inn. They rode together to the First National Bank Tower in downtown Portland. Van Horn showed Satterfield two safe-deposit boxes containing ten kilograms of cocaine obtained from the Drug Enforcement Administration Laboratory. Satterfield took a two-gram sample for testing. Van Horn also gave him the keys to the safe-deposit boxes as a token of good faith. Vandervoort arrived that evening and checked into a room Van Horn had reserved for him at the Portland Motor Hotel adjacent to the First National Bank Tower.

Neither Margolis nor Lomas were known to the Drug Enforcement Administration at this time. Van Horn was aware of their involvement in the conspiracy only as unidentified buyers who would provide a portion of the $230,000 cash payment. On April 16 Margolis and Lomas flew together from Denver to San Francisco and then to Portland. At the airport Margolis rented a white Ford Mustang. That evening Lomas registered for two people at the Chumaree Rodeway Inn near the airport.

Van Horn had further dealings with Satterfield on April 16. In the evening Van Horn drove him to the Hilton Hotel in downtown Portland. Satterfield indicated that his associates wanted to conduct a melt-point test to determine the quality of the sample of cocaine Van Horn had given him. Satterfield called at about 9:00 P.M. and reported the group was pleased with the results. The transaction was to be consummated the next day.

On the morning of April 17 Lomas and Margolis moved to the Hilton. At approximately 5:00 P.M. that afternoon Van Horn picked up James and Satterfield at the Coliseum Holiday Inn and drove to the Hilton. While Van Horn's vehicle was parked outside the hotel, Craig Para approached the van and handed Van Horn an empty briefcase in which to carry the drugs after the sale. Para then walked to the rear of the van, returning shortly with another briefcase. The four men then proceeded to the First National Bank Tower.

Drug Enforcement Administration agents observing the activities at the Hilton noted that Para obtained the second briefcase from a white Mustang which had pulled up behind Van Horn's vehicle. The license plates were identical to those on the car rented by Margolis the preceding day. Two white males were inside. The Mustang followed the van as it left the Hilton.

Para and Satterfield accompanied Van Horn to a private room inside the safe-deposit vault where they exchanged the money for cocaine. The briefcase which Para had obtained from the white Mustang contained $100,000. Satterfield and Para were apprehended upon leaving the room. James was taken into custody in another part of the bank where he was acting as a lookout. Simultaneously, Vandervoort was arrested pursuant to a warrant at his hotel room.

Meanwhile, agents stationed around the bank focused upon two men, later identified as Margolis and Lomas. Inside the bank Van Horn communicated with his agents on the street and monitored their radio transmissions through a telephone link with the Drug Enforcement Administration's Portland Office. When the office advised Van Horn that his agents had identified the two occupants of the Mustang and that the surveillance team believed the two men were scouting the area for police, he ordered their arrest.

Shortly before 6:00 P.M. Agent Boggs approached Lomas, identified himself, and made the arrest. Lomas was handcuffed and placed in a police car. Boggs then joined another federal agent in a search for Margolis. Boggs found Margolis and engaged him in conversation while his colleague approached, gun drawn, from the rear. When the other agent arrived, Boggs identified himself as a federal narcotics officer and requested that Margolis accompany them across the street to the Portland Motor Inn to talk for a few minutes. As

they walked Margolis identified himself and asked the officers to explain the problem. Boggs stated they were investigating the violation of federal narcotics laws and advised Margolis of his rights. In the parking area of the Portland Motor Inn Margolis made some exculpatory statements and again asked the agents to explain the situation. Boggs told him that it appeared that he and Lomas were involved in a drug transaction and formally placed Margolis under arrest. At that time Boggs's colleague again gave Margolis *Miranda* warnings. Boggs searched Margolis and found a receipt for Room 2214 at the Portland Hilton. Margolis also had the keys to the Mustang in his possession. While Boggs and the other agent transported him to the Drug Enforcement Administration office for processing, Margolis made inculpatory statements minimizing his role in the conspiracy. When they arrived, Margolis was advised of his rights a third time. He agreed to give a brief oral statement in which he admitted minor involvement in the transaction. He claimed he was promised expenses, several hundred dollars, and a "good time" for his effort. Margolis refused to prepare a written statement, claiming that to do so would endanger his life.

Agent Wilma was in charge of surveillance at the Hilton. He was informed that a warrant was being sought for Room 2214 but was ordered in the meantime to obtain the registration form for the room, to see who was occupying the room, and to secure the room if empty to prevent the destruction of evidence pending application for the search warrant. The registration form provided by the hotel management showed that the room was registered to "P. Margolis." Wilma did not recognize the name.

Between 7:25 and 8:00 P.M. Wilma, accompanied by a local deputy and a member of the Hilton security staff, knocked at the door of the hotel room. When he received no answer he used a passkey to enter. According to Wilma's testimony he and the deputy entered Room 2214 for the sole purpose of determining that there was nobody inside. The entire procedure took less than thirty seconds and they noticed nothing incriminating. Upon exiting, they locked the door to the room from the outside so that it could be opened only with the assistance of the hotel management.

A warrant to search Room 2214 was returned at 11:00 P.M. The search revealed a balance-beam scale, commonly used to weigh drugs, and a melt-point test kit. Lomas's fingerprints appeared on these items. In the pocket of a pair of blue jeans found in the room was a note with Satterfield's room number at the Coliseum Holiday Inn.

### ISSUES ON APPEAL

We discuss four issues: 1) whether the indictment should have been dismissed because of outrageous government conduct; 2) whether there was probable cause for arrest; 3) whether Margolis's hotel room was illegally seized; and 4) whether Lomas's fourth amendment rights were implicated in the seizure of Room 2214. The defendants raise several additional points premised on their contention that they were arrested without probable cause. Since we find probable cause to arrest we do not address them.

■ 1. *Outrageous Government Conduct:* Defendants concede that it is permissible for the government to employ undercover operatives and paid informants to infiltrate an ongoing criminal operation. *United States v. Russell,* 411 U.S. 423, 93 S.Ct. 1637, 36 L.Ed.2d 366 (1973); *United States v. Wylie,* 625 F.2d 1371, 1378 (9th Cir.1980), *cert. denied,* 449 U.S. 1080, 101 S.Ct. 863, 66 L.Ed.2d 804 (1981); *United States v. McQuin,* 612 F.2d 1193, 1195–96 (9th Cir.), *cert. denied,* 445 U.S. 954, 955, 100 S.Ct. 1607, 1608, 63 L.Ed.2d 791 (1980). They also acknowledge that in the course of an undercover narcotics investigation, an agent may provide something of value to a criminal enterprise, including the drugs themselves, to gain the confidence of those involved in illicit activity. *Hampton v. United States,* 425 U.S. 484, 489, 96 S.Ct. 1646, 1649, 48 L.Ed.2d 113 (1976) (opinion of Rehnquist, J.); *id.* at 491–92, 96 S.Ct. at

1650–51 (Powell, J., concurring); *United States v. Gonzales-Benitez,* 537 F.2d 1051, 1055 (9th Cir.), *cert. denied,* 429 U.S. 923, 97 S.Ct. 323, 50 L.Ed.2d 291 (1976). However, Margolis and Lomas contend that the Drug Enforcement Administration's conduct in this case was intolerable because Van Horn not only provided the cocaine, but instigated the criminal activity.

Neither Margolis nor Lomas can allege entrapment. They were not drawn into the conspiracy through contact with Van Horn, Cunningham, or any other agent of the government. We do not subscribe to the theory of derivative entrapment. *United States v. Shapiro,* 669 F.2d 593, 597–98 (9th Cir.1982); *United States v. McClain,* 531 F.2d 431, 437–38 (9th Cir.), *cert. denied,* 429 U.S. 835, 97 S.Ct. 102, 50 L.Ed.2d 101 (1976). However, we do recognize the related but independent defense of outrageous government conduct. *Greene v. United States,* 454 F.2d 783 (9th Cir.1971). A defendant barred from claiming entrapment may still invoke the outrageous government conduct defense if he was subjected to police conduct repugnant to the American system of criminal justice. While the Supreme Court has never specifically approved the defense, it has not foreclosed the possibility that police involvement in a crime may be so excessive as to require the dismissal of any charges arising from the extralegal activity. *See Hampton,* 425 U.S. at 493–95, 96 S.Ct. at 1651–52 (Powell, J., concurring); *id.* at 497, 96 S.Ct. at 1653 (Brennan, J., dissenting); *Russell,* 411 U.S. at 431–32, 93 S.Ct. at 1642–43. Nevertheless, the defendants' resort to the outrageous conduct defense in this case is unavailing.

In the two cases in which federal appellate courts have squarely upheld an outrageous government conduct argument, the defendants would not have had the capacity to commit the crimes with which they were charged without the government's assistance. *See United States v. Twigg,* 588 F.2d 373, 380–81 (3d Cir.1978); *Greene,* 454 F.2d at 786–87. In both cases the government not only provided resources for the production of contraband but bore primary responsibility for its manufacture. We do not suggest that the specific activity found intolerable in *Twigg* and *Greene* presents the only situation in which the defense is appropriate, *see, e.g., United States v. Archer,* 486 F.2d 670, 674–77 (2d Cir.1973), but the government activity addressed in those cases serves as a useful contrast to the Drug Enforcement Administration's undercover involvement in the instant case. Vandervoort and his associates were actively searching for a South American source to supply cocaine. In fact, James and Satterfield gave Cunningham $37,000 following his conversion from informer to entrepreneur in a futile attempt to obtain the drug. Though Van Horn offered to provide the cocaine and facilitated its purchase by permitting the group's members to make payment at the time of delivery, he was not the driving force behind the conspiracy. Vandervoort and Satterfield requested meetings with Van Horn and his purported supplier to negotiate terms. The two of them also organized the syndicate to provide the necessary funds without any assistance from the government. The government's conduct was not " 'so grossly shocking and so outrageous as to violate the universal sense of justice.' " *United States v. Bagnariol,* 665 F.2d 877, 883 (9th Cir.1981) (per curiam) (quoting *United States v. Ryan,* 548 F.2d 782, 789 (9th Cir.1976), *cert. denied,* 430 U.S. 965, 97 S.Ct. 1644, 52 L.Ed.2d 356 (1977)), *cert. denied,* 456 U.S. 962, 102 S.Ct. 2040, 72 L.Ed.2d 487 (1982); *see also United States v. Lue,* 498 F.2d 531, 533–35 (9th Cir.), *cert. denied,* 419 U.S. 1031, 95 S.Ct. 513, 42 L.Ed.2d 306 (1974).

2. *Probable Cause:* A court will recognize that law enforcement officers had probable cause to make an arrest if "at the moment the arrest was made ... the facts and circumstances within their knowledge and of which they had reasonably trustworthy information were sufficient to warrant a prudent man in believing that the petitioner had committed or was committing an offense." *Beck v. Ohio,* 379 U.S. 89, 91, 85 S.Ct. 223, 225, 13 L.Ed.2d 142 (1964).

■ The "prudent man" of the *Beck* formulation, however, is not necessarily the ordinary lay person. In determining whether there was probable cause to arrest Margolis and Lomas, the trial court took into account the experience and expertise of the agents observing their activity on the street. *See United States v. Bernard,* 623 F.2d 551, 560 (9th Cir.1979); *United States v. Wabnik,* 444 F.2d 203, 205 (2d Cir.), *cert. denied,* 404 U.S. 851, 92 S.Ct. 88, 30 L.Ed.2d 91 (1971). " 'Conduct innocent in the eyes of the untrained may carry entirely different "messages" to the experienced or trained observer.' " *Bernard,* 623 F.2d at 560 (quoting *Davis v. United States,* 409 F.2d 458, 460 (D.C.Cir.), *cert. denied,* 395 U.S. 949, 89 S.Ct. 2031, 23 L.Ed.2d 469 (1969)).

The attention of agents conducting surveillance outside the First National Bank Tower during a crowded Friday afternoon rush hour fixed upon Margolis and Lomas walking the streets. After a broadcast over the police radio alerted officers on the scene that the white Mustang was linked to the conspiracy, the agents spotted it parked on a side street across from the bank. Lomas and Margolis on separate occasions each walked over to the Mustang and looked inside. In addition, Margolis approached a Drug Enforcement Administration car in which an agent was seated and glanced through a back window. Finally, Lomas was seen standing on a corner looking over the top of a newspaper in the direction of the bank. The agents believed that Margolis and Lomas were stalking the outside of the bank to determine if police were present, that they were the two people connected with the white Mustang, and that Margolis was looking for a radio in the dashboard of an unmarked Drug Enforcement Administration vehicle to determine if the person inside was a police officer.

■ An individual officer in a coordinated investigation need not have personal knowledge of all the relevant facts to effect an arrest. It is sufficient if the pool of objective data possessed by the group of agents acting in concert supplies the requisite probable cause. *Bernard,* 623 F.2d at 560–61. Van Horn had no firsthand knowledge of the activity in the street nor was he informed of the specific observations of his subordinates when he authorized the arrests of Margolis and Lomas. He based his decision upon the conclusions of his agents reported over the radio that the two were associated with the white Mustang and were walking the streets looking for police. As long as the objective information underlying the field evaluations provided the necessary probable cause to order the arrests, it was not improper for Van Horn to rely on data transmitted to him in summary or conclusory form. *Id.* at 561.

■ The underlying facts supporting a probable cause determination are subject to review under the "clearly erroneous" standard. *United States v. O'Connor,* 658 F.2d 688, 690 (9th Cir.1981); *United States v. Jones,* 612 F.2d 453, 456–57 (9th Cir.), *cert. denied,* 445 U.S. 966, 100 S.Ct. 1656, 64 L.Ed.2d 242 (1980); *United States v. One Twin Engine Beech Airplane,* 533 F.2d 1106, 1108–09 (9th Cir.1976) (per curiam). From the objective information within the collective knowledge of the men stationed outside the bank, the trial court could properly conclude that the inferences drawn by the agents were reasonable. Though the mere presence of Margolis and Lomas in an area in which a crime was being committed is not sufficient to implicate them in the criminal activity, *United States v. Jennings,* 468 F.2d 111, 114 (9th Cir.1972), the trial court found the evidence sufficient to link them to the transaction taking place inside the bank. This ultimate finding of probable cause was also not clearly erroneous. *See O'Connor,* 658 F.2d at 690–91 & n. 5.[3]

---

**3.** Although the language in the forfeiture case of *United States v. One Twin Engine Beech Airplane,* 533 F.2d 1106, 1108–09 (9th Cir. 1976), may be construed as conflicting with this standard of review, that case has been distinguished from fact situations similar to the one before us. *United States v. O'Connor,* 658 F.2d 688, 690 n. 5 (9th Cir.1981). Even if the *United States v. One Twin Engine Beech Airplane* standard of review were to apply, however, we would come to the same conclusion.

3. *Seizure of Room 2214:* The defendants urge the exclusion of evidence recovered from Margolis's hotel room pursuant to a warrant, claiming that it was tainted by the previous illegal search and seizure of the room. Their contention raises the following questions: 1) whether Agent Wilma's act of "securing" the room by locking the door constituted a seizure; 2) if so, whether such a seizure was illegal; and 3) the conditions under which the court may admit evidence found in a hotel room during a search pursuant to a warrant but after the room has been illegally seized. An analysis of these issues requires a discussion of our holdings in *United States v. Allard,* 600 F.2d 1301 (9th Cir.1979) (*Allard I*) and *United States v. Allard,* 634 F.2d 1182 (9th Cir.1980) (*Allard II*).

■ In the absence of exigent circumstances the warrantless entry of government agents into Margolis's hotel room to conduct even the most cursory search was illegal. *See Vale v. Louisiana,* 399 U.S. 30, 34–35, 90 S.Ct. 1969, 1971–72, 26 L.Ed.2d 409 (1970). Further, "[w]e draw no Fourth Amendment distinction between 'searches' and 'seizures' of residences. Seizures of residences, like searches, require a warrant, unless exigent circumstances are present." *United States v. Kunkler,* 679 F.2d 187, 189 n. 1 (9th Cir.1982). Under the broad definition of police activity constituting the seizure of a room announced in *Allard II,* we conclude that unless there were exigent circumstances to justify the failure to obtain a warrant, *see, e.g., Kunkler,* 679 F.2d at 191–92 (9th Cir.1982); *United States v. Spanier,* 597 F.2d 139, 140 (9th Cir.1977), the entry and subsequent securing of Room 2214 for approximately three hours was illegal. *But see People v. Arnau,* 58 N.Y.2d 27, 444 N.E.2d 13, 457 N.Y.S.2d 763 (1982) (4–3 decision).

Like the instant case, the *Allard* appeals resulted from a Drug Enforcement Administration investigation of a cocaine distribution operation. Two agents, White and Bagby, entered a hotel room and questioned its occupant about his knowledge and participation in the scheme. After five to ten minutes of questioning White phoned an Assistant United States Attorney to request a warrant to search the room. A warrant was issued approximately two hours after the agents entered. During that interval White and Bagby, subsequently joined by two other agents, waited in the hotel room. At a pretrial hearing the district court suppressed evidence taken in the search.

In the first appeal, *Allard I,* the government argued that the initial warrantless entry was not a fourth amendment search. Thus, it contended, no search occurred until a valid warrant was obtained. We rejected this position, ruling that even though there was probable cause, in the absence of an exception to the warrant requirement the warrantless entry was an illegal search which a later warrant could not retroactively authorize. 600 F.2d at 1303–04. We held further, however, that the illegal entry into and occupation of the hotel room would not compel suppression of the evidence recovered after issuance of the search warrant if there were sufficient independent grounds for obtaining the warrant apart from information gathered in the course of the improper activity. *Id.* at 1305 (citing *Wong Sun v. United States,* 371 U.S. 471, 487, 83 S.Ct. 407, 417, 9 L.Ed.2d 441 (1963) (quoting *Silverthorne Lumber Co. v. United States,* 251 U.S. 385, 392, 40 S.Ct. 182, 183, 64 L.Ed. 319 (1920)) and *United States v. Bacall,* 443 F.2d 1050 (9th Cir.1971)). The case was remanded to the district court to determine whether observations made during the illegal entry were a substantial factor in the ultimate decision to seek a warrant. 600 F.2d at 1306.

The district court found that the warrant was not based upon unlawfully acquired information and denied Allard's suppression motion. He appealed once again. A different panel ruled that the entry and occupancy of the hotel room was not only an illegal search but an illegal seizure for which the "independent source" requirement offered inadequate protection of fourth amendment rights.

The distinction between searches and seizures in this instance is more than mere semantics. Our holding in *Allard II* was not limited to warrantless entries, but di-

rected also at police attempts to maintain the status quo by exercising control over a place while seeking a search warrant. 634 F.2d at 1186–87. The opinion concluded:

Accordingly, we hold that where a defendant establishes that the government illegally 'secured' and thereby seized evidence, and that seizure continues while the government procures a search warrant, the defendant has demonstrated a sufficient nexus between the illegality and the subsequently seized evidence notwithstanding any 'independent source' supporting the warrant. Upon establishing this nexus, the burden shifts to the government to demonstrate that it would have both independently discovered and successfully obtained the proffered evidence notwithstanding the illegal seizure.

*Id.* at 1187.

Given the thrust of the *Allard II* rationale, we cannot fairly distinguish that case from the one before us. Though the officers here exercised control over a hotel room by locking the door rather than waiting inside and decided to seek a warrant before they entered the room rather than afterward, these differences are not legally significant.[4] The trial court believed that the federal agents acted properly in secur-

ing the room and so did not consider whether exigent circumstances precluded them from obtaining a warrant prior to their seizure of Room 2214. Nor is there indication in the record that the seizure "made no practical difference." *Id.*

However, following his lawful arrest Margolis made voluntary statements in which he admitted participation in the conspiracy. The evidence recovered from his hotel room was therefore cumulative. While it added to the weight of the proof linking him to the transaction, Margolis's activity outside the bank coupled with his confessions render the admission of this evidence harmless beyond a reasonable doubt. *See Chapman v. California,* 386 U.S. 18, 24, 87 S.Ct. 824, 828, 17 L.Ed.2d 705 (1967). Accordingly, we affirm Margolis's conviction.

■ 4. *Violation of Lomas's Fourth Amendment Rights.* Our conclusion that in the absence of exigent circumstances the government illegally seized Room 2214 does not afford Lomas the right to challenge the government's use of items obtained from the room unless he had " 'a legitimate expectation of privacy in the invaded place.' " *United States v. Salvucci,* 448 U.S. 83, 91– 92, 100 S.Ct. 2547, 2552–53, 65 L.Ed.2d 619

---

4. In *Allard II* the district court found that the agents did not base their decision to seek a warrant upon any information discovered after they had secured the room. Nevertheless, we held that independent evidence sufficient to justify the issuance of a warrant did not remove the taint from evidence found during the actual search. We added the additional requirement that the government demonstrate that it would have recovered the incriminating evidence without an illegal seizure because we believed that the difficulty of assessing the quantum of evidence existing at the time police conducted a seizure made the independent source analysis impractical. 634 F.2d at 1186–87. We also concluded that admitting evidence found in an illegally secured room without a showing that the seizure made no difference would "eviscerate the very purpose of the warrant requirement which is to place a neutral magistrate between the public and police conduct." *Id.* at 1187 (citing *Franks v. Delaware,* 438 U.S. 154, 98 S.Ct. 2674, 57 L.Ed.2d 667 (1978); *United States v. Rettig,* 589 F.2d 418 (9th Cir. 1978); and *United States v. Korman,* 614 F.2d 541, 551 (6th Cir.)

(Merritt, J., dissenting), *cert. denied,* 446 U.S. 952, 100 S.Ct. 2918, 64 L.Ed.2d 808 (1980)).

The dissent does not go so far as to state that in the absence of exigent circumstances the officers in the instant case acted properly by securing Room 2214 without a judicial determination of probable cause. Yet the test the dissent advocates would allow police to seize places upon their own initiative whenever they deduced there was sufficient evidence to convince a magistrate that they had legitimate grounds for a search. In addition, focusing upon the timing of the officers' decision to obtain a warrant poses the same problems for a reviewing court as does the independent source analysis. See *United States v. Griffin,* 502 F.2d 959, 961 (6th Cir.), *cert. denied,* 419 U.S. 1050, 95 S.Ct. 626, 42 L.Ed.2d 645 (1974). Using that subjective decision as a benchmark for determining whether to excuse unlawful police conduct accomplishes a return to the independent source rationale of *Allard I* simply by accelerating the time-frame of the analysis. Only the en banc court can adopt such a course. We will not do so under the guise of interpretation.

(1980) (quoting *Rakas v. Illinois,* 439 U.S. 128, 14[3], 99 S.Ct. 421, 430, 58 L.Ed.2d 387 (1978)). We find the record inadequate to determine whether Lomas had such an interest.

█ The trial judge assumed at the outset that both defendants had a basis for challenging the admissibility of evidence recovered from the hotel room registered in Margolis's name. However, fourth amendment rights are personal. Lomas cannot challenge the admissibility of illegally seized evidence unless he can demonstrate that he had a constitutionally protected interest in Room 2214. *See Rakas,* 439 U.S. at 138–40, 99 S.Ct. at 427–28; *United States v. Perez,* 644 F.2d 1299, 1303 (9th Cir.1981). Since Lomas's counsel had no opportunity to generate a record that would enable us to decide this question, we remand. At the hearing before the district court Lomas will have the burden of proving that his own fourth amendment rights were violated by the seizure. *See Rawlings v. Kentucky,* 448 U.S. 98, 104–05, 100 S.Ct. 2556, 2561, 65 L.Ed.2d 633 (1980); *Perez,* 644 F.2d at 1304.

## CONCLUSION

Margolis and Lomas were apprehended at the conclusion of a valid undercover operation. Their arrests were made with probable cause. We uphold Margolis's conviction because, even granting that the seizure of his hotel room was illegal, the evidence against him is so compelling that any advantage the government gained from its improper conduct could not possibly have a bearing upon his guilt.

In order for Lomas to maintain that the government violated his fourth amendment rights, he must show that he had a legitimate expectation of privacy in the hotel room. His conviction is reversed and his case remanded to allow the district court to determine whether he had such an interest in Room 2214 of the Portland Hilton. If the court finds that Lomas has a basis for challenging the admissibility of evidence taken from the hotel room, it must decide the merits of his suppression motion. The court need not suppress the evidence recovered from the search of the hotel room if the government can demonstrate 1) that the seizure of the room was not illegal due to the existence of exigent circumstances or 2) that, had an illegal seizure not occurred, it would have recovered the incriminating evidence through some other route. Should the government make neither showing, the court should reassess Lomas's conviction. Following this determination, which should be concluded at the earliest possible date, the cause will be resubmitted to the original panel for review and final disposition.

We express no view at this time whether, without the items seized from Room 2214, the government proffered sufficient evidence to find Lomas guilty beyond a reasonable doubt of conspiracy to possess cocaine with intent to distribute.

AFFIRMED in part and REVERSED and REMANDED in part.

WALLACE, Circuit Judge, concurring and dissenting:

I concur in the result of the majority's opinion as to the conviction of Margolis. I also concur in parts 1 and 2 of the opinion. I dissent from the majority's reversal of Lomas's conviction and the remand of his case. I write separately primarily to explain my disagreement with the majority's unwarranted extension of *United States v. Allard,* 634 F.2d 1182 (9th Cir.1980) (*Allard II*), to the facts of this case.

### I

The facts surrounding the seizure of room 2214 are substantially different from those in *Allard II.* There, two Drug Enforcement Agency agents made a warrantless entry into the hotel room of Berg. The agents originally went to the hotel room to "continue their investigation." 634 F.2d at 1184. After questioning Berg for five to ten minutes, however, the agents "decided that they had 'probable cause to stay there,' and that a search warrant should be obtained." *Id.* The two agents, subsequently joined by two other agents, waited in the

hotel room for approximately two hours, while others sought and eventually obtained a warrant.

At a pretrial hearing, the district court suppressed evidence taken in the search. In the first appeal, *United States v. Allard,* 600 F.2d 1301 (9th Cir.1979) (*Allard I*), we held that in the absence of an exception to the warrant requirement, the warrantless entry was an illegal search which a later warrant could not retroactively authorize. *Id.* at 1303–04. We held further, however, that despite the illegal entry into and occupation of the hotel room, the evidence recovered after issuance of the search warrant need not be suppressed if there were sufficient independent grounds for obtaining the warrant apart from information gathered in the course of the improper activity. *Id.* at 1305–06. We remanded the case for the district court to determine whether information gathered during the illegal entry was a substantial factor in the decision to seek a warrant. *Id.* at 1306.

On remand, the district court found that the government's decision to seek a warrant was not tainted by any unlawfully acquired information and denied Allard's motion to suppress. In a second appeal, we did not limit our inquiry to the reason for which we had remanded the case in *Allard I.* Stepping aside from that issue, we rejected the independent source rule we had clearly defined in *Allard I* and established a new test in which the government must prove "that it would have both independently discovered and successfully obtained the proffered evidence notwithstanding the illegal seizure." *Allard II, supra,* 634 F.2d at 1187. We justified this course of events by announcing that there had been a fuller development of the facts on remand, *id.* at 1183 n. 1, although we did not mention any specific fact not considered originally.

The majority assumes that *Allard II* is controlling in this case and thus concludes that the evidence seized from room 2214 must be suppressed unless the government can demonstrate the existence of exigent circumstances or meet its burden under *Allard II.* I would confine *Allard II* to its

facts and hold that it does not apply to the facts here.

In *Allard II,* the decision to seek a warrant was not made until *after* the government agents had entered Berg's hotel room. While the warrant was being applied for, four government agents remained in the room with Berg, not allowing him to leave or even go to the restroom alone. By contrast, in the instant case, the government began the process of obtaining a search warrant for room 2214 *before* instructing agent Wilma to secure the room to prevent destruction of evidence. The entry into the room was for the sole purpose of determining if anyone was inside who might destroy evidence. The entire procedure took less than thirty seconds, and the officers noticed nothing incriminating. Upon leaving the room, they locked the door from the outside so that it could be opened only with the assistance of hotel management. The room remained locked for a little over three hours, when it was searched pursuant to a warrant.

This critical difference in timing—agents deciding to procure a warrant and ordering the premises secured in the meantime to prevent destruction of evidence versus agents entering and securing the premises and then deciding to obtain a warrant—appears to me to be a reasonable basis upon which to distinguish this case from *Allard II.* *Allard II* asserts the need for the rule it adopts because

> [a]ny other holding would encourage law enforcement to "secure" or seize places and things with or without probable cause in the absence of a warrant or exigent circumstances while they seek some independent evidentiary basis to justify a search warrant. Such *post hoc justifications* are alien to the Fourth Amendment warrant and reasonableness requirements.

634 F.2d at 1187 (emphasis added). The concerns present in *Allard II* are simply not present here, where it has been shown that the government had already initiated the process of obtaining a search warrant before the room was secured. The minimal

deterrent effect to be achieved by applying the exclusionary rule to the circumstances of this case does not justify the significant cost to society of removing evidence of guilt from the jury's consideration. Instead, I would apply the independent source rule of *Allard I,* which is well engrained in the case law of both this court and the Supreme Court, and uphold the validity of the search. The district court properly applied that rule and denied the motion to suppress the evidence found in room 2214.

This court now stands alone in its interpretation of the fourth amendment and the exclusionary rule as it relates to this issue. At least four of the other circuit courts of appeal, as well as the New York Court of Appeals, have directly rejected *Allard II. United States v. Segura,* 663 F.2d 411 (2d Cir.1981); *United States v. Beck,* 662 F.2d 527, 529–30 (8th Cir.1981); *United States v. Korman,* 614 F.2d 541, 547 (6th Cir.), *cert. denied,* 446 U.S. 952, 100 S.Ct. 2918, 64 L.Ed.2d 808 (1980) (*Korman*); *People v. Arnau,* 58 N.Y.2d 27, 444 N.E.2d 13, 457 N.Y. S.2d 763 (1982); *see United States v. Annese,* 631 F.2d 1041, 1042 (1st Cir.1980). *Korman* is of particular interest in light of *Allard II*'s reliance on *United States v. Griffin,* 502 F.2d 959 (6th Cir.), *cert. denied,* 419 U.S. 1050, 95 S.Ct. 626, 42 L.Ed.2d 645 (1974) (*Griffin*). It would seem that *Griffin* is now of limited vitality in the Sixth Circuit because of *Korman.* This array of contrary authority suggests wisdom in not extending *Allard II* as the majority has done. Indeed, application of *Allard II* to facts similar to those before us has been specifically rejected by the highest court of the State of New York. *See People v. Arnau, supra.*

## II

Even if *Allard II* were properly extended to the case before us, I would still affirm the conviction of Lomas and would hold that its "independent discovery" exception has been met. It appears clear that the government "would have both independently discovered and successfully obtained the proffered evidence notwithstanding the illegal seizure." *Allard II, supra,* 634 F.2d at 1187. As an example of how the government can meet this burden, we stated that "the government might attempt to prove that under the circumstances the evidence would not have been moved and its discovery would have been inevitable." *Id.* n. 6.

I assume that this question is left open on remand because the majority instructs the district court that it need not suppress the evidence recovered from room 2214 if the government can demonstrate "that, had an illegal seizure not occurred, it would have recovered the incriminating evidence through some other route." Maj. op. at 895.

I cannot be sure, however, whether the majority removes from consideration on remand the hotel receipt found in Margolis's coat linking him to room 2214. I assume not because that would be clearly contrary to our recent application of *Allard II* in *United States v. Lee,* 699 F.2d 466, 469 (9th Cir.1982) (per curiam). The note in the instant case, like the footprints in *Lee,* were discovered prior to the illegality and thus need not be removed from the court's consideration in determining whether "the evidence would not have been moved and its discovery would have been inevitable." *Allard II, supra,* 634 F.2d at 1187 n. 6.

But I see no need to remand. I would hold that the record demonstrates the *Allard II* exception has been adequately proven. As the warrant was already applied for, I would hold that "the seizure made no practical difference," *Allard II, supra,* 634 F.2d at 1187, because the government "would have both independently discovered and successfully obtained the proffered evidence notwithstanding the illegal seizure." *Id.* Moreover, the occupants of the room, having been arrested and in police custody, were hardly in a position to remove the evidence. *See id.* n. 6.

### III

In summary, we are not confronted here with officers attempting to circumvent the warrant requirement by making an illegal entry and seizing evidence with the intent of finding some post hoc justification for a search warrant. Nor are we presented with the situation of officers attempting to abuse the exigency exception by creating the exigency. We are merely confronted with an officer who jumped the gun slightly in a good faith attempt to prevent destruction of possible evidence in a hotel room registered to a suspect who had been validly arrested and was in police custody. The brief entry into the room to detect possible occupants revealed no incriminating evidence. The officers awaited the decision of a neutral and detached magistrate before conducting a thorough search of the room. Other courts faced with this issue have denied suppression. I agree with Judge Weick that, "[a]s appellate judges, we ought not to engage in hypertechnicalities which will hamstring capable and conscientious officers of the law endeavoring to properly perform their duties in protecting the public from harmful drugs." *Korman, supra,* 614 F.2d at 547. I therefore dissent from that portion of the majority's opinion which extends *Allard II* to this case. In addition, I would not remand because even if *Allard II* were extended to this case, the record is sufficient to demonstrate that suppression is not warranted. I would affirm the convictions of both defendants.