719 So.2d 1018 (1998)
Winston SMITH, Appellant,
v.
The STATE of Florida, Appellee.
No. 97-339.
District Court of Appeal of Florida, Third District.
November 4, 1998.
*1020 Bennett H. Brummer, Public Defender, and Kirk A. Barrow, Special Assistant Public Defender, for appellant.
Robert A. Butterworth, Attorney General, Christine E. Zahralban, Assistant Attorney General, for appellee.
Before COPE, FLETCHER and SORONDO, JJ.
SORONDO, Judge.
Appellant Winston Smith appeals the lower court's denial of his motion to suppress, following a plea of nolo contendere to charges of carrying a concealed firearm and unlawful possession of a firearm or weapon by a violent career criminal, where he specifically reserved his right to appeal. We affirm.
The State and Smith stipulated that the facts contained in the information and other charging documents, as well as the facts testified to at the suppression hearing, if proven, would have established a prima facie case. At the suppression hearing, the State called Curtis Clark, Senior Special Agent for the United States Immigration and Naturalization Service (INS), on the question of whether Clark's January 1, 1996 request of Metro-Dade Police Officers to stop Smith exceeded his legal authority.
The record reflects that Clark testified to the following: On January 1, 1996, Smith was stopped by Metro-Dade Police Department Detective John Colangelo, on instructions of Clark. On the date in question, Clark had information, obtained from Smith's INS file and an INS computer printout, that Smith was involved in a pending deportation proceeding, was always armed, and had been previously apprehended by INS. Clark suspected Smith was in violation of his immigration status based on the information that he received from the INS computer printout, and thus believed Smith was a criminal alien. Clark, who had been with the INS for approximately 23 years, explained that he was looking for another young man known to be illegally in the country after having been deported as a criminal alien, and the information was that he would be at a certain address at a certain time and that Smith would probably be with him. While en route to the house, Clark called Metro-Dade police and asked for their assistance.
Smith drove up to the address as Clark was preparing to leave. Smith was a passenger in the car. Clark had a photograph and a description of Smith and immediately recognized him. The purpose for stopping Smith was to determine what his exact deportation status was and whether he was carrying a weapon. As an INS agent, it is Clark's responsibility to stop and ask for proof of I.D. and immigration status from those believed to be illegally in the country. Upon recognizing Smith, Clark requested that Colangelo stop the car. After stopping the car, Colangelo removed Smith from the car and patted him down. Clark was standing right next to Colangelo when Colangelo conducted the pat down and discovered a semi-automatic pistol Smith was carrying. There were other Metro-Dade officers and FBI agents present, acting under Clark's direction. He had worked with this same team of officers on four or five prior occasions.
Smith presented the testimony of Janice Wilson, who was driving the car in which Smith was a passenger. According to Wilson, she and Smith were going to meet a friend, and they were stopped by police for running a red light. Wilson was not given a citation for any traffic violation.
Smith also presented Colangelo's testimony, who testified to the following: He was assigned to assist Clark in looking for illegal or wanted aliens and to assist him in a police function as a Metro-Dade police officer. He stopped Smith's car at Clark's request. This was not a traffic stop. On stopping the car, Colangelo approached the stopped vehicle with his gun drawn and requested that Smith put his hands up in the air. Colangelo then opened the passenger door and requested that Smith put his hand on the roof of the car. Assisted by Detective Ruesga, Colangelo *1021 held Smith's arms and patted him down for weapons. Colangelo stated that although he stopped the car on Clark's request, he did the rest for officer safety. Colangelo stated that at the time he requested Smith to exit from the car, Colangelo had no idea who Smith was and had no idea whether he was armed or not. Not knowing these things, he had to assume the worst, so he patted Smith down. Colangelo stated that Smith was arrested after the weapon was found in his waistband and that he was not free to leave after exiting the car.
The trial court denied Smith's motion to suppress, finding that in this particular situation, based on Clark's request to stop the car and based on Colangelo's testimony, Colangelo was allowed, for officer safety, to determine whether or not any of the individuals in the car were armed. Thus, the pat down was permissible because the Court was satisfied that the actions were not in violation of Smith's Fourth Amendment rights.
We note that decisions of a trial court in considering a motion to suppress come to an appellate court clothed with a presumption of correctness, McNamara v. State, 357 So.2d 410 (Fla.1978), and a reviewing court will interpret the evidence and reasonable inferences derived therefrom in a manner most favorable to such a ruling. See Glas v. State, 329 So.2d 341 (Fla. 3d DCA 1976); State v. Pye, 551 So.2d 1237, 1239 (Fla. 1st DCA 1989).

I.
We begin with Smith's first point on appeal. Smith argues that in order to lawfully stop the car in which he was traveling, the officers must have had a well-founded suspicion of criminal activity or cause to believe that there was a traffic violation. See Payne v. State, 654 So.2d 1252 (Fla. 2d DCA 1995). In support of this contention, Smith states that Colangelo testified at the suppression hearing that he was instructed to stop the car by Clark, he was not told why to stop the car or whether the occupants were believed to be wanted or armed. Thus, there was no evidence to establish a founded suspicion of criminal activity, or that a traffic violation had occurred.
The State responds that Clark acted within his legal authority in requesting that the car in which Smith was a passenger be stopped because Clark's main purpose was to check Smith's immigration status. We agree with the State's contention.
When an officer of the INS is able to articulate objective facts providing a reasonable suspicion that the subject of the seizure was an alien illegally in this country, he is allowed to investigate a person's immigration status. Title 8 U.S.C. § 1357(a)(1) (1996) authorizes any officer or employee of the INS, without a warrant, to interrogate any alien or person known to be an alien as to his right to be or remain in the United States. See United States v. Alvarez-Sanchez, 774 F.2d 1036, 1041 (11th Cir.1985). In order to justify a seizure, however, the agent must articulate objective facts providing a reasonable suspicion that the subject of the seizure was an alien illegally in this country. United States v. Brignoni-Ponce, 422 U.S. 873, 884, 95 S.Ct. 2574, 45 L.Ed.2d 607 (1975); Benitez-Mendez v. Immigration and Naturalization Serv., 760 F.2d 907, 909 (9th Cir.1983), as amended (1985).
In order to justify the stop in this case, Clark must have had a reasonable suspicion that Smith was an illegal alien in this country. Clark testified that he requested that police stop Smith and inquire into Smith's immigration status because Smith was previously apprehended by INS, was involved in a pending deportation proceeding, and was known to be always armed. These facts were sufficient to establish the reasonable suspicion necessary to justify Smith's detention.
However, because Colangelo, not Clark, was the officer who actually stopped Smith, the facts here necessitate the application of the "fellow officer" or Whiteley rule. The "fellow officer" rule, first adopted in Whiteley v. Warden, 401 U.S. 560, 91 S.Ct. 1031, 28 L.Ed.2d 306 (1971), allows an arresting officer to rely upon the strength of a directive or bulletin on a suspect and assume probable cause exists to arrest the particular person identified in the bulletin; thus, the *1022 arresting officer is not required to have sufficient firsthand knowledge to constitute probable cause. See Carroll v. State, 497 So.2d 253 (Fla. 3d DCA 1985). It is enough that the police officer initiating the chain of communication either had first-hand knowledge or received his information from some person, usually the victim, official source, or eye witness, who it seems reasonable to believe is telling the truth. See Salas v. State, 246 So.2d 621, 622 (Fla. 3d DCA 1971). The "fellow officer" rule is applicable whether the communication is from a superior, a fellow officer with the same police department, between different agencies or agencies at different levels within a state, between officials in different states, and between federal and state or local authorities. See generally 3 Wayne R. LaFave, Search and Seizure, § 3.5(b), at 257-58 (1996). Thus, when a law enforcement officer with information amounting to probable cause directs an officer who lacks the knowledge to make the arrest, the directing officer's knowledge is imputed to the arresting officer. See Illinois v. Andreas, 463 U.S. 765, 771-72 n. 5, 103 S.Ct. 3319 n. 5, 77 L.Ed.2d 1003 (1983) (explaining that the knowledge of one official is "presumed shared" by others cooperating in an investigation). The "fellow officer" rule has been applied in cases where only a reasonable suspicion, and not probable cause, was required. See United States v. Hensley, 469 U.S. 221, 105 S.Ct. 675, 83 L.Ed.2d 604 (1985); United States v. Robinson, 536 F.2d 1298, 1300 (9th Cir.1976)(noting that although Whiteley involved probable cause rather than founded suspicion, "we perceive no substantive difference between the two doctrines that would warrant a different result").
Applying the "fellow officer" rule here, the officer who stopped Smith, Colangelo, was entitled to assume that the officer requesting aid, Clark, had sufficient information to constitute a reasonable suspicion to stop Smith. It is clear that Clark had the authority to stop Smith when he initiated the communication with the Metro-Dade Police Department. Here, one member of the law enforcement team at the scene of the search, Clark, had the authority to stop Smith. Consequently, by application of the "fellow officer" rule, Colangelo had the authority to stop Smith.

II.
Having justified the stop, we now turn to Smith's second point on appeal, that the subsequent pat-down was improper. Smith argues that Colangelo had no information about him before his detention began and did not conduct a background check on him before arresting him. Thus, Smith claims that the officers did not reasonably believe him to be armed and dangerous. Therefore, they were not justified in removing him from the car and searching him for weapons, because a pat down incident to an investigatory stop may be conducted only where the officer reasonably believes the detainee is armed with a dangerous weapon. See Sapp v. State, 592 So.2d 786 (Fla. 2d DCA 1992). Furthermore, section 901.151(5), Florida Statutes (1995), requires probable cause to believe the person temporarily detained is armed with a dangerous weapon before proceeding with a search.[1]
The State, on the other hand, argues that Colangelo had a reasonable suspicion that Smith was carrying a weapon and that because the trial court's findings and decision on the motion to suppress come to this Court clothed with a presumption of correctness, this Court should interpret the evidence and reasonable inferences derived therefrom in a manner most favorable to such ruling. See Freeman v. State, 559 So.2d 295 (Fla. 1st DCA 1990).
In addressing this issue, we need not decide whether Colangelo himself had a reasonable suspicion that Smith was carrying a weapon because we find that by application *1023 of the "fellow officer" rule, the pat down can be justified. However, we note that this part of our analysis does not involve a straightforward application of the "fellow officer" rule because the facts here must be distinguished from a typical "fellow officer" or Whiteley type case. In Whiteley, there was a directive or request from another agency disseminated to police agencies across the state giving the names and descriptions of the suspects, describing the car they were believed to be in, and indicating that an arrest warrant for them had been issued. 401 U.S. at 564-67, 91 S.Ct. 1031. Here, there was a request for a stop but there was no request or directive to pat down. However, we find that the fact that Colangelo was not privy to the information Clark had about Smith always being armed does not render this pat down unlawful. Based on the collective knowledge of the officers working here as a team, probable cause existed to conduct a pat down of Smith. The pat down was valid because Colangelo's actions can be justified on the grounds that Clark, who was at the scene, was in possession of the underlying facts which justified Colangelo's actions.
We are aware that some courts have required a direct communications link, such as in the form of a directive or request, between the officer who possesses the probable cause and the arresting officer. See 3 Wayne R. LaFave, Search and Seizure, § 3.5(c) at 265-70; United States v. Edwards, 885 F.2d 377 (7th Cir.1989); United States v. Woods, 544 F.2d 242 (6th Cir.1976); Haywood v. U.S, 584 A.2d 552 (D.C.App. 1990); State v. Crowder, 1 Hawaii App. 60, 613 P.2d 909 (1980); People v. Creach, 69 Ill.App.3d 874, 25 Ill.Dec. 886, 387 N.E.2d 762 (1979), aff'd in part, 79 Ill.2d 96, 37 Ill.Dec. 338, 402 N.E.2d 228; Salter v. State, 163 Ind.App. 35, 321 N.E.2d 760 (1975), State v. Mickelson, 18 Or.App. 647, 526 P.2d 583 (1974), Commonwealth v. Gambit, 274 Pa.Super. 571, 418 A.2d 554 (1980). However, as one commentator has noted, in these cases (as in Salter, for example), the officer who possessed the probable cause was not in a close time-space proximity to the arrest or search in question. Thus, when the officer who does possess the probable cause is in a close time-space proximity, evidence of a direct communications link between the officers is not necessarily required. See 3 Wayne R. LaFave, Search and Seizure, § 3.5(c) at 265-70. What is required is that an officer connected to the arrest knows facts justifying the arrest.
Illustrative of this point is United States v. Ragsdale, 470 F.2d 24, 30 (5th Cir.1972). In Ragsdale, the defendant's car was stopped for speeding by two police officers. One of the officers, Officer Jones, asked the defendant to accompany him to his patrol car so that a traffic citation could be prepared. When the defendant exited his car, Officer Jones saw a pistol protruding from a paper sack on the floor of the defendant's car. As Officer Jones passed the other officer at the scene, Officer Mullens, who was standing at the rear of the stopped car, he whispered that there was a gun under the defendant's front seat. Officer Mullens then went to the car, opened the door and found the gun. However, at the motion to suppress hearing, Officer Mullens stated that he did not hear Officer Jones whisper the statement and that he searched the car as a general safety precaution. The United States Court of Appeals for the Fifth Circuit stated the following:
If Mullens had not commenced the search when he did, Jones would surely have commanded it, or would have put Ragsdale in Mullens' custody and performed it himself.
* * * * * *
Factually and practically the search at this precise point in time and space was mandated by Jones' view of Ragsdale's gun. The fact that one member of the team moved too swiftly, which sometimes invalidates the result, should not thwart the proof of truth here where there existed a clear justification, and indeed demand, for the prompt search made. On this night and at this spot it would be hypertechnical to insist on bifurcating the knowledge of the officers and isolating Mullens from the realities of the existing situation.
* * * * * *
In this case, the search and its consequent fruits, the evidence of bank robbery, would imminently and lawfully have been made *1024 and discovered at this very time and place and by this team of officers even if Mullens had scrupulously regarded Ragsdale's Fourth Amendment rights and refrained from searching at the moment he did because Jones had the duty to conduct the search the moment he discovered Mullens had not received his whispered message. Had the exclusionary rule been effective to deter Mullens from making the search it would have almost instantaneously gone forward under Jones' lawful direction. Thus, a technical application of the exclusionary rule would accomplish only one thing in the case at barthe criminal would go free.
Id. at 30. See also United States v. Perkins, 994 F.2d 1184 (6th Cir.1993)(probable cause found from the "collective knowledge of all these police officers and special agents, who were directly involved in the investigation that led to the search in question"); United States v. Kye Soo Lee, 962 F.2d 430 (5th Cir.1992)(probable cause found from the "collective knowledge of the agents working the case at the roadside"); United States v. Bertrand, 926 F.2d 838 (9th Cir.1991)("information possessed by the undercover police woman and the lookout officer provided the backup team with probable cause to make the arrest, regardless of whether that information was actually communicated to them"); United States v. Cruz, 834 F.2d 47 (2d Cir. 1987)(in finding probable cause court used "the collective knowledge of all of the officers involved in the surveillance efforts" regarding a moving vehicle where "the various law enforcement officers in this investigation were in communication with each other"); United States v. Lomas, 706 F.2d 886 (9th Cir.1983)(court stated it "is sufficient if the pool of objective data possessed by the group of agents acting in concert supplies the requisite probable cause" and "individual officer in a coordinated investigation need not have personal knowledge of all the relevant facts to effect an arrest"); Morgan v. State, 286 Ark. 264, 691 S.W.2d 164 (1985)(probable cause found in case where various deputies were investigating burglaries; court stressed "the officers did collectively have probable cause"); Tillman v. State, 271 Ark. 552, 609 S.W.2d 340 (1980)(court used "collective information of the police officer" approach; all officers were on the scene at the time of the search of the car); Justus v. State, 438 So.2d 358 (Fla.1983)(court noted that trial court "was authorized to consider all the collective knowledge and information of all the officers involved in the investigation"); State v. Bunker, 67 Haw. 174, 681 P.2d 984 (1984)(court found collective knowledge approach proper when two officers acting in concert in making arrest); Commonwealth v. Wooden, 13 Mass.App.Ct. 417, 433 N.E.2d 1234 (1982)(probable cause found where officers were "working in concert and they were within an arm's reach of each other as well as the suspects whom they were confronting"; officer A saw defendant drop envelope, officer B saw defendant stuff something in pocket, no communication of these facts between A and B and both facts essential to probable cause); Doleman v. State, 107 Nev. 409, 812 P.2d 1287 (1991)(collective knowledge approach found proper regarding all facts possessed by the police involved in this investigation); Pyles v. State, 755 S.W.2d 98 (Tex.Crim.App.1988)(court stated "the sum of the information known to the cooperating agencies or officers at the time of an arrest or search by any of the officers involved is to be considered in determining whether there was sufficient probable cause").
Colangelo testified that he was assigned to assist Clark to look for illegal or wanted aliens and that he conducted a pat down for his own as well as the other detectives' safety. He testified that Clark knew that Smith was armed with a weapon. If the knowledge of this team of officers is viewed in isolation, because Clark is the one who knew that Smith was always armed, then, as some cases hold, Clark, not Colangelo, would be the only one allowed to search. However, Clark was at the scene, and thus was close in time and proximity. He would surely have ordered the pat down or performed it himself, had Colangelo not done it, since he testified that one of the reasons he directed the stop of Smith's car was because Smith was known to be always armed and he wanted to see if Smith was armed. As stated in Ragsdale, it would be hypertechnical under these set of facts to insist on bifurcating the *1025 knowledge of the officers and isolating Colangelo from the "realities of the existing situation", that Smith had a gun. See also State v. Sams, 676 So.2d 1045 (Fla. 5th DCA 1996)(if the officer initiating an arrest is ultimately found by a court to have had probable cause to make an arrest or search, it does not matter whether the officer who carried out the directive of the initiating officer had on his own, a basis to determine that probable cause existed)(relying on Carroll, 497 So.2d at 260); Voorhees v. State, 699 So.2d 602 (Fla.1997)(probable cause can be demonstrated through the collective knowledge of police officers involved in an investigation even if some of the information known to other officers is not communicated to the arresting officer).
Based on the foregoing, we affirm the denial of the respondent's motion to suppress the firearm.
NOTES
[1] As stated by the First District Court of Appeal in Harvey v. State, 703 So.2d 1113 (Fla. 1st DCA 1997), "The meaning of `probable cause' to support a valid frisk is different from the stricter `probable cause' standard that must justify a search warrant or an arrest. As used in [section 901.151(5)], `probable cause' means reasonable belief or suspicion in conformity with Terry and other federal precedent." Id. at 1115 n. 2 (citations omitted). See also State v. Webb, 398 So.2d 820, 824-825 (Fla.1981).