# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT JACKSON
### November 2, 2010 Session

## STATE OF TENNESSEE v. RANDALL KEITH SMITH AND NICHOLAS RYAN FLOOD

**Direct Appeal from the Circuit Court for Henry County**
**Nos. 14444 and 14446      Donald E. Parish, Judge**

---

**No. W2009-02678-CCA-R3-CD  - Filed December 27, 2011**

---

Following the discovery by police of numerous materials commonly used in the manufacture of methamphetamine on property controlled by Defendant Randall Keith Smith, he was convicted of manufacturing methamphetamine, a Class C felony, and possession of drug paraphernalia, a Class A misdemeanor.  He was sentenced as a Range II, multiple offender to ten years in the Department of Correction for manufacturing methamphetamine and to a concurrent eleven months and twenty-nine days for possession of drug paraphernalia. Defendant Nicholas Ryan Flood, who was in the company of Defendant Smith when the materials commonly used in the manufacture of methamphetamine were discovered on the property, was convicted of a single count of manufacturing methamphetamine.  Defendant Flood was sentenced as a Range II, multiple offender to nine years in the Department of Correction.  On appeal, Defendant Smith claims that the trial court erred by admitting certain evidence seized from his property under the auspices of a search warrant.  Defendant Flood claims that there was insufficient evidence to support his conviction and that the sentence imposed by the trial court was excessive.  After carefully reviewing the record and the defendants' arguments, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Circuit Court Affirmed**

JOHN EVERETT WILLIAMS, J., delivered the opinion of the Court, in which JERRY L. SMITH and CAMILLE R. MCMULLEN, JJ., joined.

Paul Hessing, Paris, Tennessee, for the appellant, Randall Keith Smith.

Guy T. Wilkinson, District Public Defender, and W. Jeffrey Fagan, Assistant District Public Defender, for the appellant, Nicholas Ryan Flood.

Robert E. Cooper, Jr., Attorney General and Reporter; David H. Findley, Senior Counsel;

Hansel J. McCadams, District Attorney General; and James Williams, III, and Beth B. Hall, Assistant District Attorneys General, for the appellee, State of Tennessee.

**OPINION**

In the early morning hours of November 5, 2008, Henry County Sheriff's Department Deputy Jamie Myrick was patrolling along Pleasant Hill Road in Henry County, Tennessee. As he passed the residence located at 2465 Pleasant Hill Road, he detected a chemical odor which, from his law enforcement experience, he associated with the production of methamphetamine. He parked his car and walked a short distance toward the residence. While standing on the public road using night vision equipment, he observed a lit room through an open window of the residence. Vapors and smoke were billowing out of that open window, and the curtains inside appeared to be moving outward as if blown by a fan. After watching for about ten minutes, Deputy Myrick observed an individual (later identified as Defendant Flood) approach the open window from the back of the house with an object which he either handed to someone inside or placed on the window's ledge.

Deputy Myrick radioed headquarters and reported the situation to his supervisors, who began the process of preparing an affidavit for a search warrant based on the information they received from him. They instructed him to remain on the scene and continue observation until additional backup arrived and the warrant could be secured. Soon thereafter, Corporal Mellon arrived as backup for Deputy Myrick, and the two observed a pickup truck arrive at the residence. The officers then heard two truck doors open and close, and they surmised that two individuals had just left the vehicle and entered the residence.

These persons (later determined to be Mr. James Staveley and Mr. Gary Herrin) subsequently attempted to leave in their vehicle. Pursuant to orders they received from headquarters, the deputies unsuccessfully attempted to detain the vehicle at the entrance to the public roadway as it left the premises. After narrowly missing the officers, the vehicle sped off, but not before the officers were able to take down its license tag number and visually identify its occupants.

Believing that their presence had been revealed to anyone inside the house by the noises that had been made in their attempt to stop the escaping vehicle, the officers then made the decision to leave the public road, enter private property, and approach the residence in order to ensure that no other occupants escaped. As they neared, they heard a cell phone ringing and a male voice exclaim, "the cops are outside." Deputy Myrick could smell that the noxious fumes were getting stronger as he approached the residence, and was also able to hear scuffling, running, and the sounds of rattling glass. He reached the house and decided to elevate himself several feet by climbing onto a rock foundation pier that extended out

slightly from the house's side so he could peer into the residence through the open kitchen window. Inside, he observed three persons, at least two of whom were engaged in what he believed to be the disposal of the remnants of a methamphetamine production by pouring chemicals down the kitchen sink's drain. Deputy Myrick shouted an order for them to remain still. One of the individuals, Defendant Smith, complied, but Defendant Flood and a woman later identified as Ms. Samantha Arnold fled the room. Deputy Myrick requested permission to search the premises, but Defendant Smith denied this initial oral request.

Additional officers continued to arrive, and the police on the scene consulted with police headquarters. Collectively, a decision was made to enter the premises due to safety concerns pertaining to the close proximity of what police believed to be inflammable (and potentially explosive) methamphetamine chemicals to a heated wooden stove. All three individuals found inside the residence were arrested. Both prior to and during this entry, police incidentally observed a modest amount of what they suspected to be contraband, including a mason jar and coffee filters, but none of this property was actually seized. Defendant Smith, Defendant Flood, and Ms. Arnold were handcuffed and placed in patrol cars. Defendant Smith was read his *Miranda* rights and, sometime thereafter, signed a "Permission to Search" form.

As these events were transpiring, the police on the scene stayed in contact with both their superiors and Lieutenant Scott Wyrick of the Henry County Sheriff's Office Metro Crimes Unit. Lieutenant Wyrick, who was trained and certified in processing and dealing with methamphetamine labs, crafted an affidavit in support of a search warrant for the premises that generally included the facts described above. Afterward, he presented the affidavit to a General Sessions Court judge, who signed the warrant shortly after Defendant Smith gave his written consent to search the premises. Lieutenant Wyrick took the warrant to Pleasant Hill Road and, armed with both the warrant and Defendant Smith's written consent, the police on the scene again entered the residence.

During the ensuing search, police found numerous incriminating items in and around the residence. Police found a piece of burnt aluminum foil, a razor blade, and a lighter under a sofa cushion in the living room. In that same room, they found a digital scale with a white residue that field-tested positive for methamphetamine. In another room, a backpack containing coffee filters was found (no coffee maker was found in the residence). Next to the open kitchen window, a mason jar, a round glass bowl, and a turkey baster were found. A blue cooler containing drain cleaner, starter fluid, and acetone was found in a barn on the property. A blue metal gas can with a fabricated air hose attachment was found on a table in the barn. Nearby were several stripped lithium batteries and a coffee filter that field tested positive for methamphetamine. A Pyrex jug was also found containing wet pill sludge, which later tested positive at the TBI lab for the presence of methamphetamine. A bag on

the outskirts of the property contained "liquid fire" (a drain cleaner) and a red funnel. Near a Ford Explorer belonging to Defendant Flood, police found an air compressor. Various other items often associated with the production of methamphetamine were also found on the property, including assorted glassware and some lye. With the exception of a few items mentioned earlier, all of these items were seen by police for the first time during this extensive search conducted pursuant to the search warrant. The police seized these items.

On March 2, 2009, Defendants Smith, Flood, and Samantha Arnold (who is not part of this appeal) were each indicted on one count of manufacturing methamphetamine. Defendants Smith and Flood were also indicted on one count of possession of drug paraphernalia, and Defendant Smith was indicted on one count of tampering with evidence. The State dismissed this last count prior to trial.

Defendant Smith filed suppression motions related to the warrantless search of his premises, as well as to evidence obtained pursuant to the search warrant. On April 9, 2009, the trial court held a hearing to parse through the relatively complex Fourth Amendment issues raised by the facts of the case. Defendant Smith argued that the police lacked probable cause when they entered and conducted a warrantless search of his premises and that information obtained during this illegal search was then used to unlawfully obtain the ensuing search warrant. However, the State responded that the initial entry onto the property by the police and their initial entry into Defendant Smith's residence were permissible. The State argued that its officers were lawfully positioned on a public road when they detected the distinct chemical odor of drug manufacturing, thereby giving them probable cause to investigate further, and that, during the course of that investigation, the existence of exigent circumstances (*i.e.,* the possibility of an explosion of unattended chemicals) enabled them to enter the premises without first needing to obtain either the owner's consent or a search warrant. The State further urged that both the search warrant and the defendant's written consent served to empower the police to conduct the later, more extensive search of the property. After hearing the evidence, reviewing the relevant legal precedent, and carefully listening to the parties' arguments, the trial judge ruled that the officers had entered the defendant's property without constitutional authorization and granted Defendant Smith's motion to suppress the warrantless search. Because no evidence was actually seized by the police during these entries, no actual evidence was suppressed, but the State was prohibited from introducing at trial any testimony concerning events that transpired or observations made by the police between the time Deputy Myrick left the public road and the time the search warrant was executed.

Turning to Defendant Smith's motion to suppress the evidence seized during the extensive search of the premises, the trial judge first ruled that the defendant's written consent to the search was tainted by his improper arrest and detention. However, the trial

court upheld the search as conducted under the auspices of the search warrant and declined to suppress any of the seized evidence. The trial judge reached this conclusion by first redacting the State's affidavit in support of the warrant to remove any and all references to information obtained by the police as a result of their unlawful entry (*i.e.*, all references pertaining to events that occurred after the time Deputy Myrick left the public roadway), thereby purging the affidavit of any legally tainted information. However, the trial court found that the search warrant affidavit, as redacted, sufficed to establish probable cause and that this fact sufficed to render the ensuing search constitutionally permissible.

The defendants were tried by jury on August 19-21, 2009. The State presented the testimony of Lieutenant Wyrick, who testified to his considerable experience and familiarity with the operation and components of methamphetamine labs. Lieutenant Wyrick testified that there is a unique smell associated with methamphetamine production and that this smell is easily recognizable to trained officers. He testified that on the night in question, he prepared an affidavit in support of a search warrant application for Defendant Smith's premises based on facts relayed to him by Officer Myrick. After submitting the affidavit and receiving the search warrant, Lieutenant Wyrick testified that he arrived at the defendant's premises, executed the search warrant, and found the various items described above. Lieutenant Wyrick explained to the jury how each of the items that were seized could be used in the production of methamphetamine. He further testified that each of these individual items, even if stored together in close proximity, would not create the aforementioned odor that is unique to the manufacture of methamphetamine; this smell can only be created if and when these various items are used in methamphetamine production. Finally, Lieutenant Wyrick identified Defendant Smith as possessing the premises that were searched on the night in question and identified Defendant Flood and Ms. Arnold as having also been present at the scene.

Thereafter, the State presented the testimony of Ms. Melanie Johnson, Special Agent of Forensic Science at the Tennessee Bureau of Investigation laboratory in Memphis, Tennessee. She testified that she tested some sludge collected and sent to her by the Henry County Police Department and that this material, which weighted 0.4 grams, tested positive for the presence of methamphetamine. Following this testimony, the State presented the testimony of Deputy Jamie Myrick, who gave lengthy testimony concerning the events he witnessed on the night in question, as was described above.

Finally, the State presented the testimony of the two individuals who fled the premises in the pickup truck on the night in question. Mr. Gary Herrin, who had all charges against him dismissed in exchange for his testimony, testified that, at an earlier point in time, he brought Defendant Smith three boxes of Sudafed (an over-the-counter cold medicine commonly used as a methamphetamine precursor) with the understanding that he would be

-5-

reimbursed for the items with either cash or finished methamphetamine product. Mr. Herrin testified that both he and Mr. James Staveley returned to Defendant Smith's residence on the night in question in Mr. Staveley's vehicle, so that he could receive his payment. Mr. Herrin testified that Defendant Smith and Defendant Flood met them outside the residence and took them inside, where Mr. Herrin smelled the strong odor of methamphetamine production. They sat on the living room couch, and Defendant Flood went into the kitchen, where Ms. Arnold was located. Later, Defendant Smith entered the kitchen, pulled out a set of scales, separated out and weighed 1.5 grams of finished methamphetamine product, and gave it to Mr. Herrin. Afterward, he, Defendant Smith, and Mr. Staveley smoked some of the drug, and then Mr. Herrin and Mr. Staveley left in Mr. Staveley's vehicle. When individuals with flashlights attempted to stop their vehicle, they drove off and attempted to escape.

The last witness for the State was Mr. James Staveley, who began by detailing his criminal history and explaining that all current charges against him would be dismissed in exchange for his testimony. Mr. Staveley stated that: (1) he drove his truck with Mr. Gary Herrin to Defendant Smith's premises on the night in question; (2) Defendants Smith and Flood took them into Defendant Smith's residence; (3) he smelled a strong chemical odor inside; and (4) while he was there, he smoked some methamphetamine with Defendant Smith and Mr. Herrin. Mr. Staveley stated that when he attempted to leave the residence in his vehicle, he was frightened by some men with flashlights and sped away. Sometime later, he was arrested. Mr. Staveley testified that while he was in jail with Defendant Smith, Defendant Smith stated to him that the police had "nothing they can charge me with," in part because he had put all of the methamphetamine in the house in the fireplace. At the conclusion of this testimony, the State rested.

None of the defendants presented any evidence in their own defense. Each defendant was advised of and waived his or her right to testify in his or her own defense, pursuant to the procedures described in *Momon v. State*, 18 S.W.3d 152, 162-64 (Tenn. 1999). The case was then submitted to the jury. On August 21, 2009, the jury found Defendants Smith and Flood guilty of manufacturing methamphetamine and found Defendant Smith guilty of possession of drug paraphernalia. Ms. Samantha Arnold was found guilty of the lesser included offense of facilitation of the manufacture of methamphetamine.

On September 19, 2009, the trial court sentenced Defendant Smith to ten years as a Range II, multiple offender for the manufacturing of methamphetamine conviction and to a concurrent eleven months and twenty-nine days for possession of drug paraphernalia. The trial court sentenced Defendant Flood to nine years as a Range II, multiple offender for his manufacturing of methamphetamine conviction. Defendants Smith and Flood each filed a timely motion for a new trial. These were denied on November 24, 2009. The requisite notices of appeal were timely filed, and these appeals followed.

I.

Defendant Smith raises a single challenge concerning the trial court's denial of his motion to suppress the evidence seized by police pursuant to the search warrant. Defendant Smith agrees with the trial court that the initial warrantless entry by police onto his property was unlawful but asserts that all items seized during the execution of the later search warrant should have been suppressed under the Fourth Amendment pursuant to the well-known "fruit of the poisonous tree" doctrine. *See Wong Sun v. United States*, 371 U.S. 471, 488 (1963). Defendant Smith maintains that the search warrant obtained by the police cannot serve as an independent, "unpoisoned" source of discovery for the items found during the search, because the initial affidavit for the search warrant made reference to some facts and evidence uncovered during the illegal entry. Defendant Smith contends that the trial court erred by redacting the search warrant affidavit to eliminate any reference to these illegally-garnered facts and evidence and, thereafter, considering whether the resulting redacted affidavit sufficed to establish probable cause (thus supporting the General Sessions judge's decision) in order to uphold the search warrant. However, after reviewing the facts and relevant precedent, we believe that the trial court not only acted appropriately on this score but keenly parsed through the difficult legal issues involved. Consequently, we affirm its decision to deny Defendant Smith's motion to suppress the items found pursuant to the search warrant.

We must analyze Defendant Smith's challenge to the trial court's denial of his motion to suppress under the standard established in *State v. Odom*, 928 S.W.2d 18 (Tenn. 1996). "Under this standard, 'a trial court's findings of fact in a suppression hearing will be upheld unless the evidence preponderates otherwise.'" *State v. Hicks*, 55 S.W.3d 515, 521 (Tenn. 2001) (*quoting Odom*, 928 S.W.2d at 23). However, Defendant Smith does not dispute the trial court's findings of fact. Under the *Odom* standard, a trial court's conclusions of law are reviewed "under a *de novo* standard without according any presumption of correctness to those conclusions." *Hicks*, 55 S.W.3d at 521. Because Defendant Smith challenges only the trial court's legal conclusion that it was permitted to redact the search warrant of any reference to illegally-obtained information and evidence (and thereafter uphold the search warrant because the affidavit as redacted still sufficed to established probable cause), we review his claim *de novo*.

Both the United States Constitution and the Tennessee Constitution generally prohibit (1) the police from searching a citizen's home without first obtaining a search warrant, and (2) judges from issuing such warrants in the absence of probable cause. *See* U.S. CONST. amend. IV ( stating "the right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated" and asserting that search warrants shall issue only "upon probable cause, supported by Oath or affirmation"); Tenn. Const. art. I, § 7 (stating "the people shall be secure in their persons, houses, papers

and possessions, from unreasonable searches and seizures," and precluding the issuance of search warrants except upon "evidence of the fact committed"). "Probable cause" for purposes of upholding a warrant has long been defined as a "reasonable ground of suspicion," supported by circumstances warranting the belief that an illegal act is occurring or has occurred. *Lea v. State*, 181 S.W.2d 351, 352 (Tenn. 1944). If the State is found to have violated the constitutional rights described above, the possible consequence is well-known – any and all evidence discovered during the unlawful search may be suppressed pursuant to the exclusionary rule. *See, e.g.*, *Murray v. United States*, 487 U.S. 533, 536 (1988); *Weeks v. United States*, 232 U.S. 383, 398 (1914).

Almost simultaneously with the creation of the exclusionary rule, the United States Supreme Court developed the "independent source" doctrine. *See Murray*, 487 U.S. at 537-39. This doctrine permits the State to utilize any evidence that would otherwise be suppressed pursuant to the exclusionary rule if that evidence is obtained through an independent, lawful search or from other "activities untainted by the initial illegality." *Id.* at 537. The rationale behind the development of this doctrine is that "the interest of society in deterring unlawful police conduct and the public interest in having juries receive all probative evidence of a crime are properly balanced by putting the police in the same, not a worse, position that they would have been in if no police error or misconduct had occurred." *Nix v. Williams*, 467 U.S. 431, 443 (1984). The independent source doctrine also applies to claims brought under the Tennessee Constitution. *State v. Clark*, 844 S.W.2d 597, 600 (Tenn. 1992).

Following the independent source doctrine, "an unconstitutional entry does not compel exclusion of evidence found within a home if that evidence is subsequently discovered after execution of a valid warrant obtained on the basis of facts known entirely independent and separate from those discovered as a result of the illegal entry." *Clark*, 844 S.W.2d at 600 (*citing Segura v. United States*, 468 U.S. 796, 813-14 (1984)). After its redaction by the trial court, it is undisputed that the affidavit for the search warrant of Defendant Smith's premises made reference only to facts discovered prior to (and therefore separate from) the unlawful entry and that the redacted affidavit sufficed to establish probable cause for the issuance of a search warrant. Consequently, if the redaction was proper, the trial court's denial of the motion to suppress was proper under the independent source doctrine as expounded in *Segura* and *Clark*.

Defendant Smith urges that the practice of redacting an affidavit of material discovered as a result of an illegal entry itself violates our state supreme court's decision in *Clark*, relying on language in that case to the effect that, "[i]n order for the subsequent warrant and search to be found genuinely independent of the prior unconstitutional entry, [*Murray* requires] that information obtained during the illegal entry *may not have been*

*presented* to the issuing Magistrate." *Id.* (emphasis added). Defendant Smith argues that while the affidavit may have been subsequently redacted, the information obtained during the illegal entry was, nonetheless, initially *presented* to the magistrate and, therefore, violates the United State's Supreme Court decision in *Murray* as interpreted by our supreme court in *Clark*.

However, Defendant Smith's argument reads this language in *Clark* too literally and inconsistently with both federal practice and the practice of this court. The *Clark* decision did not deal directly with the issue of redaction. While the phrase, "may not have been presented," if taken absolutely literally, would appear to entirely prohibit the common independent-source-related practice of redacting any affidavit that includes both tainted and lawfully obtained information, in practice, material that has been redacted from an otherwise tainted affidavit is, for purposes of *Clark* and *Murray*, deemed to have never been presented to the issuing authority, and any resulting search is deemed constitutional so long as the redacted affidavit has been properly scrutinized and still suffices to establish probable cause.

Nothing in the practice of redacting affidavits is inconsistent with either *Clark* or *Murray*. In *Murray*, the United States Supreme Court considered the situation of federal agents who entered a warehouse without a warrant, saw illegal drugs, and then applied for a warrant without mentioning the prior entry or making any reference to any information gained as a result. 487 U.S. at 535-36. In the course of holding that the evidence seized pursuant to that search warrant was admissible under Fourth Amendment principles, the Supreme Court squarely accepted the argument that the independent source doctrine permitted admission of "all evidence acquired in a fashion untainted by the illegal evidence-gathering activity," including "evidence initially discovered during, or as a consequence of, an unlawful search, but later obtained independently from activities untainted by the initial illegality." *Id.* at 537-38. In ruling that the search warrant at issue was potentially an "activit[y] untainted by the initial illegality," the Court relied on the government's contention that the agents' decision to seek the warrant was not prompted by what they had found during the illegal search and that material from the illegal search was not included *and relied upon* by the magistrate in his decision to issue the warrant. *Id.* at 542. It would appear to be the Supreme Court's assertion that the inclusion of tainted material must have "affected [the magistrate's] decision to issue the warrant" before any resulting search might be deemed unconstitutional, *id.*, which permits the practice of redaction for Fourth Amendment purposes; if probable cause still exists for a warrant to be issued after an affidavit has been redacted of all tainted material, then it is reasonable to infer that the magistrate did not rely on the tainted material in issuing the warrant.

Since the Supreme Court's decision in *Murray*, the Sixth Circuit has continued its longstanding practice of redacting "mixed" affidavits that contain both tainted and untainted

material. Beginning several years prior to *Murray*, the Sixth Circuit had applied the independent source rule in such a manner that "when a search warrant is based partially on tainted evidence and partially on evidence arising from independent sources, if the lawfully obtained information amounts to probable cause and would have justified issuance of the warrant apart from the tainted information, the evidence seized pursuant to the warrant is admitted." *United States v. Smith*, 730 F.2d 1052, 1056 (6th Cir. 1984) (*quoting United States v. Williams*, 633 F.2d 742, 745 (8th Cir. 1980) (internal quotation omitted)). Following the *Murray* decision, the Sixth Circuit continued to apply this precedent unabated in situations legally indistinguishable from the case at bar. *See United States v. Shamaeizadeh*, 80 F.3d 1131, 1136 (6th Cir. 1996); *United States v. Campbell*, 878 F.2d 170, 173 (6th Cir. 1989). Without making explicit reference to *Murray*, the Sixth Circuit justified its ongoing decision to redact mixed affidavits by analogizing the situation of affidavits partially comprised of the fruits of an illegal search to the situation of affidavits partially comprised of false statements, in which redaction was the established remedy, *see Franks v. Delaware*, 438 U.S. 154 (1978), and noting that the Supreme Court "has also applied the *Franks* principle where a warrant has been approved in reliance on an affidavit containing information obtained through illegal surveillance." *Campbell*, 878 F.2d at 172 (*citing United States v. Karo*, 468 U.S. 705, 719 (1984)). Implicit in this reasoning would appear to be the premise that, if the Supreme Court had intended to overrule *Karo* and change existing circuit court practice in *Murray*, it would have done so explicitly. In the absence of any express direction to the contrary, "irrespective of the legality of the initial entry into the residence to secure the premises, we can nevertheless examine the balance of the underlying search warrant affidavit for probable cause in order to determine whether the lawfully obtained evidence was sufficient to determine that the search and seizure should be upheld." *Shamaeizadeh*, 80 F.3d at 1136 (*quoting United States v. Korman*, 614 F.2d 541, 547 (6th Cir. 1980)).

In a similar vein, this court has never interpreted and applied the Tennessee Supreme Court's *Clark* decision, which only interpreted and applied *Murray*, as forbidding the practice of redacting mixed affidavits. The *Clark* decision involved police officers who, in the course of investigating a pair of stolen cars, entered a defendant's home without probable cause, consent, or exigent circumstances, and questioned him about the crimes. *See* 844 S.W.2d at 598. Following this illegal entry, this defendant made several incriminating statements and was arrested. The police then sought and received a search warrant based on these incriminating statements and found numerous incriminating items during the ensuing search. The Tennessee Supreme Court ruled that these items should have been suppressed under the Fourth Amendment, noting that the search warrant affidavit contained crucial references to the incriminating statements made by the defendant following his arrest (which apparently had never been redacted, as the trial court had upheld the search). As a result, the Tennessee Supreme Court reached the unsurprising conclusion that the warrant violated the

core principle of *Murray* that police may not profit from illegal activity by obtaining a warrant where their probable cause has been established by presenting the fruits of an illegal search or seizure to the magistrate. *See id.* at 600-01. Although the *Clark* court did not expressly discuss the issue of the magistrate's reliance on the tainted information or the possibility of redaction as a remedy, that argument does not appear to have been raised by the State, and no discussion appears to have been called for on the facts of the case.

Regardless, just like federal courts in the wake of the *Murray* decision, following *Clark*, it has remained the practice of this court to analyze the reliance issue that was so crucial to the Supreme Court in *Murray* by permitting trial courts to redact those search warrant affidavits partially tainted by illegal material of any and all references to the same and then to re-scrutinize the redacted affidavit in order to determine whether or not probable cause remains nonetheless. *See, e.g.*, *State v. Vanderford*, 980 S.W.2d 390, 399-400 (Tenn. Crim. App. 1997); *State v. Bowling*, 867 S.W.2d 338, 342-43 (Tenn. Crim. App. 1993). Indeed, in *State v. Stephen J. Udzinski and Donna Stokes a/k/a Donna Story*, No. 01C01-9610-CC-00431, 1998 WL 44922 (Tenn. Crim. App. at Nashville, Feb. 5, 1998), we were confronted with an argument virtually identical to the one made in this case – that *Murray* and *Clark* "require exclusion of the evidence as a blanket remedy where an affidavit in support of a search warrant application improperly informs the magistrate of the results of an illegal search" because the effect "the tainted information [could] have on the magistrate's ability to perform his functions" is "immeasurable." *Id.* at *23. We roundly rejected that argument and also rejected the notion that *Murray* required a subjective inquiry into what information the magistrate may have relied upon in issuing his or her decision. Instead, we opted to follow the well-accepted practice of redacting any affidavit containing both legally and illegally gathered evidence, excising all tainted material, and scrutinizing whatever remains to confirm the continued presence of probable cause. *Id.* at *30.

We reaffirm this conclusion today. As a matter of law, we can discern no reason to treat material that was improperly included by police in a search warrant affidavit as a result of an illegal entry or search any differently than material that was improperly included in a search warrant because it was obtained by police as a result of illegal surveillance (where redaction was approved in *Karo*) or material that was improperly included because it was false information that was recklessly included by police (where redaction was approved in *Franks*). The harm to society sought to be prevented is no greater in the first instance than it is in the others.

Accepting Defendant Smith's present invitation to suppress the evidence at issue would, of course, violate the core rationale underpinning the independent source doctrine – that the police not be placed in a worse position than they would have been in if no misconduct had occurred. In this case, police had all the incriminating information necessary

to establish probable cause and receive a warrant prior to entering Defendant Smith's property. Had they chosen to wait to enter the property until after they had received a warrant, all of the evidence now at issue would have been properly seized and admitted at trial. Consequently, holding that this evidence must be suppressed would leave the police in a far worse position than if they had never illegally entered the property, in direct contravention of the teachings of *Williams*. 467 U.S. at 443. We decline to so hold.

Because we have ruled that the trial court did not err in denying Defendant Smith's motion to suppress the search warrant, we find it unnecessary to address the State's arguments that: (1) the trial court erred by concluding that Defendant Smith's blanket consent – given as a condition of his then-existing probation – to the search of his property "without a warrant . . . at any time" was legally insufficient to uphold the search due to (a) the timing of the search and (b) the fact that the officer involved was unaware of Defendant Smith's status as a probationer, (2) the trial court erred in concluding that Defendant Smith did not have a diminished expectation of privacy on his premises due to his status as a probationer, and (3) the trial court erred in concluding that Defendant Smith's written consent to the search given after his arrest was unconstitutional. Now rendered moot by our resolution of Defendant Smith's claim, we leave these potentially thorny issues for another day.

## II.

Defendant Flood challenges the sufficiency of the evidence to support his conviction for manufacturing methamphetamine. However, with respect to challenges concerning sufficiency of evidence, a jury's guilty verdict strips a defendant of the presumption of innocence and replaces it with a presumption of guilt. *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011). Defendants must strive to overcome this presumption on appeal. *Id.* Defendant Flood has not met this burden. He generally claims that "the inconsistencies in the State's case are such that there was not a showing of sufficient evidence to convict the defendant of Methamphetamine Manufacture." Inconsistencies in the prosecution's evidence do not give rise to an insufficiency of the evidence claim. Regardless, reviewing the record as a whole, we find the evidence sufficient to support the jury's verdict.

"When the sufficiency of the evidence is challenged, the relevant question is whether, after reviewing the evidence in the light most favorable to the State, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Dorantes*, 331 S.W.3d at 379; *see also* Tenn. R. App. P. 13(e); *Jackson v. Virginia*, 443 U.S. 307, 319 (1979). Great weight is given to the result reached by the jury in a criminal trial; matters such as the credibility of witnesses, the weight given their testimony, *and the proper resolution of any conflicts in the evidence* are ordinarily left in their care. *Dorantes*, 331 S.W.3d at 379 (emphasis supplied). "On appeal, the State must be afforded the strongest

legitimate view of the evidence and all reasonable inferences that may be drawn therefrom." *Id.* (*quoting State v. Vasques*, 221 S.W.3d 514, 521 (Tenn. 2007)). Under no circumstances may an appellate court "substitute its inferences for those drawn by the trier of fact." *Id.*

Defendant Flood was convicted of violating Tennessee Code Annotated section 39-17-417(a)(1), which states that "[i]t is an offense for a defendant to knowingly . . . [m]anufacture a controlled substance." T.C.A. § 39-17-417(a)(1) (2011). A violation of this statute that involves "methamphetamine in an amount of less than point five (.5) grams, is a Class C felony." *Id.* at § 39-17-417(c)(2)(A). Defendant Flood appears to challenge the State's proof concerning both (1) whether any manufacturing of a controlled substance was occurring on the property and (2) whether he was aware of and knowingly participated in any such manufacturing.

Concerning whether any controlled substance was being manufactured on the premises, Defendant Flood points out that the State's witnesses testified that: (1) all of the items the police found during their search of the property, when combined together, were still not enough to successfully manufacture methamphetamine, and (2) neither anhydrous ammonia nor Sudafed (or any other form of Ephedrine), both of which are necessary components for the manufacturing of methamphetamine, were found on the property. Concerning his lack of participation in any methamphetamine manufacturing that may have occurred on the premises and his general lack of *mens rea*, Defendant Flood observes that both State's witnesses Gary Herrin and James Stavely testified that he was not in the room and did not participate when they smoked methamphetamine with Defendant Smith earlier that morning. The State's police witnesses further testified that the items used to smoke the methamphetamine, as well as the scales and much of the other evidence, were hidden from sight and were only uncovered during the ensuing search by police – and thus would not have been in the plain view of Defendant Flood merely because he was in the house. Defendant Flood urges that the State failed to disprove his contention that he was on Defendant Smith's property on the day in question solely for the purpose of deer hunting (and carried a crossbow for that purpose) and that none of the State's witnesses could place him in the barn where many of the incriminating items were found or, for that matter, even state with any certainty that the incriminating items found in the barn were not left over from an earlier methamphetamine lab, which had existed and been quarantined on the property in 2007. Finally, Defendant Flood urges that the pill sludge found by police in the barn could have tested positive for methamphetamine due to cross-contamination by the police officers and crime lab technicians handling the evidence.

These arguments, brought to light by the skilled cross-examination of the State's witnesses by Defendant Flood's trial counsel, show that Defendant Flood was well-represented during his trial. A reasonable jury might have accepted them and concluded that

Defendant Flood was not guilty of the offense charged (and apparently did so with respect to the charge of possession of drug paraphernalia). However, it is well established that, based on the sufficiency of the evidence, these sorts of inconsistencies in the State's evidence and/or disagreements concerning the inferences to be drawn from circumstantial evidence provide no basis for an appeal. *See Dorantes*, 331 S.W.3d at 379.

As the trial judge astutely noted in the course of denying certain defense motions, viewing all of the evidence, and drawing all inferences in the light most favorable to the State, the evidence suffices to support Defendant Flood's conviction. With respect to whether methamphetamine was, in fact, being manufactured on the premises on the night in question, several witnesses testified that an odor uniquely associated with methamphetamine production could be detected emanating from Defendant Smith's residence and that this odor was so strong that it could be detected from the public road a considerable distance away. Following a search of the residence, numerous items associated with the production of methamphetamine were found. The jury was free to infer from this evidence that methamphetamine had been recently produced on the premises and reject the defense's contention that no such conclusion should be reached because some of the necessary elements were never discovered. Moreover, several items field-tested, and some wet pill sludge taken from the barn lab-tested, positive for the presence of methamphetamine. The jury was free to infer that these items did so because methamphetamine had been recently produced on the premises and was free to reject the defense's implication that they did so because of contamination by the police.

With respect to Defendant Flood's *mens rea* pertaining to the offense, there is, likewise, sufficient evidence to support the jury's conclusion. Numerous witnesses testified that Defendant Flood was on the premises and in the company of Defendant Smith during the early morning hours of the night in question. Deputy Myrick testified that he initially observed Defendant Flood appear from behind Defendant Smith's residence and that Defendant Flood placed an unidentified object through that house's open window – a window that had visible vapors emanating from it along with the detectable odor of methamphetamine production. Two witnesses testified that Defendants Flood and Smith met them outside Defendant Smith's house and that Defendant Flood accompanied them inside the house where the strong odor of methamphetamine production was present. Those same witnesses further testified that Defendant Flood was in the kitchen of that residence when Defendant Smith went into that same room and then returned with finished methamphetamine product. Defendant Flood's vehicle was found parked behind a barn in which numerous incriminating items were discovered. A cooler located next to Defendant Flood's vehicle contained drain cleaner, acetone, starter fluid, and other items commonly used in the production of methamphetamine (and contained no items that could *not* be used in the process of manufacturing methamphetamine). An unusual air compressor, which one

-14-

witness identified as belonging to Defendant Flood, was found on the property, and near Defendant Flood's vehicle, the police found a bucket with a spout that had been modified to connect to that air compressor. Witnesses testified how these items could be used to produce methamphetamine. Taken together, this circumstantial evidence was sufficient for a jury to reasonably conclude that Defendant Flood was a knowing and active participant in any methamphetamine production occurring on the premises.

In sum, Defendant Flood had his fair day in court to present these evidentiary arguments to the jury, and the jury considered and rejected them. We will neither disturb a jury's resolution of conflicting evidence nor alter its evidentiary inferences on appeal. *See Dorantes*, 331 S.W.3d at 379. Consequently, Defendant's Flood's challenge to the sufficiency of the evidence to support his conviction must be denied.

III.

Defendant Flood claims that the nine-year sentence imposed by the trial judge was "excessive." However, this sentence was within the range established by the legislature for his offender class and the crime for which he was charged, a Class C felony. As the defendant concedes, his sentencing range was between six and ten years. Nine years is between six years and ten years.

"The burden of demonstrating that a sentence is erroneous is [placed] upon the party appealing." *State v. Carter*, 254 S.W.3d 335, 344 (Tenn. 2008). Our review of a trial court's sentencing decision is *de novo,* but as long as the trial court considered all the proper sentencing principles and relevant facts and circumstances, we must presume that the trial court's determinations are correct. *Id.* at 344-45. If our review reflects that the trial court properly considered all the relevant legal factors and that its findings of fact are adequately supported by the record, we must affirm the sentence even if we would prefer a different result. *State v. Goodwin*, 143 S.W.3d 771, 783 (Tenn. 2004); *State v. Pike*, 978 S.W.3d 904, 926-27 (Tenn. 1998). "If, however, the trial court applies inappropriate mitigating and/or enhancement factors or otherwise fails to follow the Sentencing Act, the presumption of correctness fails" and "our review is simply *de novo*." *Carter*, 254 S.W.3d at 345 (internal quotation omitted).

Here, the trial court appears to have followed the Sentencing Act and appropriately applied all of the sentencing factors. Defendant Flood does not challenge the trial court's determination of his sentencing range. The offense of manufacturing methamphetamine in an amount less than point five grams was a Class C felony under Tennessee Code section 39-17-417(c)(2)(A). *See* T.C.A. § 39-17-417(c)(2)(A) (2009). Defendant Flood admitted to three prior felonies, which served to properly establish his offender class as a Range II,

multiple offender. *See* T.C.A. § 40-35-106. The sentence for a Range II offender for a Class C felony is "not less than six (6) nor more than ten (10) years." T.C.A. § 40-35-112(b)(3). It is undisputed that the trial court properly determined and applied this range during Defendant Flood's sentencing. The nine-year sentence imposed by the trial court is within this range. Therefore, we can grant no relief to Defendant Flood.

Before setting Defendant Flood's sentence at nine years, the trial court carefully considered all of the statutory factors and relevant circumstances. The trial court considered the various statutory enhancement and mitigating factors urged by the parties. These factors, however, are advisory only, and the weight a trial court gives to these factors does not provide any basis for reversal. *Carter*, 254 S.W.3d at 345. As long as the trial court properly finds and considers the appropriate statutory factors, the particular sentence that the court imposes is essentially unreviewable on appeal as long as it falls within the appropriately determined range.

In this case, the trial court properly found two enhancement factors applicable to Defendant Flood: (1) he had prior criminal behavior (including prior criminal convictions) at the time of his sentencing above that necessary to establish his sentencing range, and (2) prior to sentencing, he failed to comply with the conditions of a sentence involving his release into the community. *See* T.C.A. §§ 40-35-114(1), (8). The trial court found the presence of one mitigating factor – that the defendant's criminal conduct neither caused nor threatened serious bodily injury. *See* T.C.A. § 40-35-113(1). The trial court considered and balanced these factors and ultimately concluded that, under the circumstances, the defendant presented a poor prospect for rehabilitation. The trial court accordingly imposed a sentence toward the upper end of the range. It was well within its discretion to do so.

CONCLUSION

For the foregoing reasons, the judgments of the trial court are affirmed.

_____
JOHN EVERETT WILLIAMS, JUDGE

-16-